## COMMISSIONER OF INTERNAL REVE-
## NUE v. LEHMAN.
### No. 70, Docket 20688.

Circuit Court of Appeals, Second Circuit.

Jan. 5, 1948.

384

Newton K. Fox, of Washington, D. C., Theron Lamar Caudle, Asst. Atty. Gen., and Helen R. Carloss and A. F. Prescott, Sp. Assts. to the Atty. Gen., for petitioner.

Floyd F. Toomey, Ellsworth C. Alvord and John P. Lipscomb, Jr., all of Washington, D. C., for respondent.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The Commissioner has appealed from an order of the Tax Court, which expunged a deficiency and granted a refund of income tax of the taxpayer, Allan S. Lehman, for the year 1937. The case was tried upon stipulated facts, and involves the proper computation of a tax upon a capital gain, arising from the admission of new partners into the firm of Lehman Brothers, of which the taxpayer was a member. The firm was engaged in the brokerage business; and Allan Lehman became a partner in 1908. On January 1, 1936—there being at that time six partners—a seventh was admitted. On May 16th of the same year, one of the partners, Arthur Lehman, died. In accordance with the articles his interest was continued until the 30th of June; and on July 1st, the account to his credit as capital in the firm books was transferred to the other partners, in exchange for a credit in liquidation, which was eventually paid to his executors. The articles had provided that the firm should continue, if the surviving partners, having more than fifty per cent of the capital so decided; they did so decide and continued the business throughout the year 1936. On the first of January, 1937, four of the existing partners—Allan Lehman among them—sold fractional parts of their rights in the firm to five new partners, and also increased the share of the partner who

had been taken in on January 1, 1936. The Commissioner taxed as a capital gain the profit made upon Allan Lehman's sale of the fractions of his interest in the firm to the new partners and to the partner taken in on January 1, 1936; and, although the amount is not in dispute, a question arises as to the period during which Allan Lehman held the "capital asset," since that determined the rate of taxation in 1937.[1]

The Tax Court held that the interest sold dated from Allan Lehman's entry into the firm in 1908, and assessed the tax accordingly. The Commissioner had assessed the tax and maintained in the Tax Court—as he now maintains before us—that the period during which the capital asset has been held when a partner sells his interest in the firm should be comminuted: that is to say, it should be computed separately for each firm asset held at the time of the sale of the partner's interest and should begin with the date when the firm acquired that asset. The Commissioner next argues that, even if this is not true, the death of Arthur Lehman on May 16, 1936, dissolved the firm and that the interest which Allan Lehman sold on January 1, 1937, was an interest in a new firm and was acquired in 1936; and that it was therefore a capital asset held for less than a year. Finally, he argues that, if he is wrong as to both the foregoing positions, nevertheless Allan Lehman added to his interest in the firm when Arthur Lehman died, and he did not show that the interests which he sold were not those which he then acquired. The burden of proof being on him, he was properly charged with holding the capital asset less than a year.

The Commissioner's first point is based upon the strict theory of the common-law that a partnership is no more than a joint ownership of the firm assets by the partners, and that, when a partner sells his interest in the firm, he sells his interest as joint owner of each firm asset. From this it would follow, he continues, that his gain must be taxed upon the basis of the period during which the firm has held each asset. In a court of common law that would be true; just as it is still true today in the

---

[1] § 117 of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 873.

case of joint owners who are not partners. A gain upon the sale of any asset held by such a group would be taxed as though it had been owned by a single person, the period during which each capital asset was held being reckoned from the date when the group acquired it. However, in equity and in bankruptcy the chancellors long ago imposed modifications upon the rights and liabilities of partners, as the common-law conceived them; and, while the firm never became a jural person, capable of being sued and of suing as such, in the administration of its affairs it did become for most purposes an entity; and it was upon this traditional structure that Congress fitted the taxation of partnerships, although it levied the income tax upon the separate distributive shares of the partners, whether they were distributed or not.

The modifications imposed upon the common law were of two kinds: not only were the individual partners not allowed to withdraw firm assets from the firm while the firm business continued; but it was a corollary that individual creditors, unlike firm creditors, were not allowed to levy upon and sell in execution their debtor's—the individual partner's—interest in firm assets. This was carried out also in bankruptcy by virtue of the doctrine that firm assets should first go to firm creditors and individual assets to individual creditors. The practical effect of these interpolations into the common law was to impound firm assets and deprive the individual partners of any control over them except in so far as they were dealing with them on behalf of the firm as a unit. The individual partner's beneficial interests as a legal joint owner were trimmed down so that he had nothing left save that the firm assets should be devoted to the firm business, that he should share in any profits they produced and in the surplus upon winding up, whether voluntary or by legal process. We have discussed all this in several tax decisions, and need add nothing to what we said in them.[2] The Uniform Partnership Law codified this congeries of rights and obligations as it had developed; and made no substantial change, when it declared in so many words that "a partner's interest in the partnership is his share of the profits and surplus."[3] For that reason, we can, and for argument we will, accept the Commissioner's position that for tax purposes we should ignore the statute: we decide the case upon the basis of the law as it was before it was codified.

The first question at bar is of the date from which we must reckon the period during which Allan Lehman held the asset which he sold on January 1, 1937; and in answering it we shall disregard any changes made by the death of Arthur Lehman on May 16, 1936. So far as concerns the minuend in the equation of gain—the "amount realized"—it makes no difference whether one uses the Commissioner's theory by which a partner's interest is comminuted, or the Tax Court's by which it is integrated and valued as a unit. Nor does it make any difference in the subtrahend—the "basis"—as to any firm assets which may have remained in kind during the whole period of the partner's membership in the firm. It is only as to the cost of those firm assets which have been acquired after his entry that any dispute emerges. The Tax Court takes the partner's contribution to the firm capital as his "basis"; the Commissioner takes the cost to the firm of each asset as the proper "basis" in the partner's equation of gain. We think that the Commissioner's theory ignores the fact that the firm by hypothesis has used firm assets to purchase the putative new asset, and that the assets so used—the firm's cost and "basis"—were not assets of the individual partners at all in the sense that they would have been, if the firm had been merely a joint undertaking. For the reasons we have given, the firm assets so used were encumbered with the trusts or charges which equity had created, which deprived the individual partners of all but vestigial beneficial interests in them. The cost to

---

[2] Harris v. Commissioner, 2 Cir., 39 F.2d 546; Helvering v. Walbridge, 2 Cir., 70 F.2d 683; Helvering v. Archbald, 2 Cir., 70 F.2d 720; Rossmore v. Commissioner, 2 Cir.. 76 F.2d 520; Helvering v. Smith, 2 Cir., 90 F.2d 590; Williams v. McGowan, 2 Cir., 152 F.2d 570, 162 A. L.R. 1036.

[3] § 52, New York Partnership Law, Consol.Laws, c. 39.

Allan Lehman of any asset acquired by the firm during his membership was something quite different; it was whatever profit would have been made out of the asset disposed of to purchase it, and whatever contribution the asset disposed of would have made to the surplus upon winding up. Obviously those are unascertainable factors, and the only possible subtrahend in the equation of gain upon the sale of a partner's interest in the firm is his original contribution to the firm capital, together with any later additions he may make. This we understand to be the reasoning of the Third Circuit in Thornley v. Commissioner,[4] with which we agree; and with deference we cannot go along with the Court of Claims in City Bank Farmers Trust Co. v. United States.[5]

■ The Commissioner's next position is that, even if the theory of the Tax Court was right, nevertheless when Arthur Lehman died on May 16, 1936, the firm was dissolved, and when the survivors assumed to continue it, as the articles provided, they did not, because they could not, avoid creating a new firm, as we said in Darcy v. Commissioner.[6] From this it follows that the capital asset which Allan Lehman sold on January 1, 1937, was the fraction of his interest in a new firm created after the death of Arthur Lehman; and that asset he had held for only a few months. It would be a corollary of this argument—which in the case at bar might well result in cancelling any capital gain whatever—that the "basis" would be the value of Allan Lehman's interest in the new firm at its formation; and this might well equal the "amount realized" on January 1, 1937. Moreover, there is a conclusive answer to the Commissioner's position. We will assume as we said in Darcy v. Commissioner, supra,[7] that when a partner dies, the firm is dissolved no matter what the articles may provide. Furthermore, it is of course true that, if the articles do not provide otherwise, upon a partner's death each of the survivors becomes entitled to his share of the surplus: it becomes equivalent to cash in hand. As such, it would be the cost and so the "basis" of any interest which the partner should acquire by using it as his contribution to the capital of a new firm which the survivors might form. Nevertheless, although nothing in the articles may be able to make a new firm of the survivors identical with the old, there is nothing to prevent the survivors from encumbering their interests in liquidation as they choose, and that is what the articles do in cases like that at bar. The effect of this is that the interest of each survivor in the surplus is charged exactly as it has been before the deceased partner's death; and, therefore, cannot figure as the cost or "basis" in any equation of capital gain of any of the survivors if he sells his interest in the new firm. The survivors' interest in the surplus is not a free asset which they can dispose of in any other way than to use it as their contribution towards the capital of the new firm.

■ The Commissioner's last argument is—to repeat—that in any event Allan Lehman got an added interest in the new firm assets by Arthur Lehman's death; and that it does not follow that what he sold on January 1, 1937 was not that interest, for it was large enough to cover all the fractions which went to the new partners. Once more the question is what was the cost to Allan Lehman of the interests in the new firm which he sold on January 1, 1937. The estate of Arthur Lehman was paid by transforming his share in the firm capital into a debt of the new firm; and the Commissioner's theory of an accretion to Allan Lehman's interest in the new firm arising from this transaction can be most plausibly stated as follows. The survivors got in exchange for the surrender of their interests in the firm assets which were sold to pay Arthur Lehman, that interest in the unsold assets which Arthur Lehman had held while he lived. That was a real exchange, and resulted in the acquisition by the survivors of new interests which were capital assets whose period of ownership dated from 1936. This is however but another instance of what we have already discussed; the transaction was between the firm and a third person—a deceased's partner's executors. What the survivors re-

---

[4] 147 F.2d 416.
[5] 47 F.Supp. 98, 97 Ct.Cl. 296.

[6] 2 Cir., 66 F.2d 581, 584.
[7] 2 Cir., 66 F.2d 581, 584.

ceived was the interest which Arthur Lehman had had in those assets which it was not necessary to dispose of in order to give his executors his share of the surplus. But the survivors did not receive that added interest in the assets as their own; the assets did not cease to be firm assets. It is true that the percentages of the survivors were increased; but percentages are not property but only mathematical symbols; and although they did share the firm assets in new proportions, the firm assets were not the same assets as before. The survivors' shares: i. e. their claims upon profits and in the surplus, were precisely what they had been before Arthur Lehman died; there had been no accretion of anything but a factor of computation.

Order affirmed.