COMMISSIONER OF INTERNAL REVE-
NUE v. WHITNEY and other consolidated
cases.

Nos. 233–245, Dockets 20877–20889.

Circuit Court of Appeals
Second Circuit.
Aug. 11, 1948.

Montgomery B. Angell, of New York City (Lucius A. Buck, of New York City, on the brief), for respondents-petitioners.

Hilbert P. Zarky, Sp. Asst. to Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen., and Sewall Key and Lee A. Jackson, Sp. Assts. to Atty. Gen., on the brief), for petitioner-respondent.

Before SWAN, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

For many years the partnership of J. P. Morgan & Co. carried on a general banking business in New York City in the firm name, and in Philadelphia under the name of Drexel & Company. In the latter part of 1939 the partners decided that their New York business should be incorporated as a trust company, and arrangements to that end—which involved also the complete separation of the Philadelphia business—were completed in March, 1940. On March 29, the State Superintendent of Banks issued a certificate authorizing J. P. Morgan & Co. Incorporated to transact the business of a trust company in New York City. The following day, Saturday, March 30, a special meeting of the directors of the corporation was held. The directors were the thirteen partners of the firm. At this meeting a resolution was adopted authorizing the corporation to purchase the assets and to assume the liabilities and obligations of the firm as set forth in a Bill of Sale and Agreement presented to the meeting. The Bill of Sale and Agreement was executed by the firm, the thirteen individual partners, and the corporation on that date. By it "the Firm and each of the Partners, respectively," sold and transferred to the new banking corporation all title to the firm "assets, rights and properties," detailed by schedule and of the aggregate agreed value of $597,098,131.87, against the assumption by the corporation of liabilities to depositors and others of $584,832,737.78. The difference of $12,265,394.09 was paid to the firm; then it (less the sum of $55,073.01 contributed to the corporation under circumstances stated below) was deposited to the accounts in the bank of the thirteen firm members in the proportionate amounts of their interests in the partnership. Among other provisions of the Bill of Sale and Agreement was a promise by each of the partners not to engage in any banking or other business in New York City or elsewhere under the name of J. P. Morgan & Co., or any other similar name, except as an officer, director, or employee of the bank. A stockholders' meeting the same day approved the action of the directors and confirmed the execution and acceptance by the bank of the Bill of Sale and Agree-

ment. The partners owned 72.9 per cent of the corporate stock and their relatives owned an additional 5.3 per cent. The bank opened for business on Monday, April 1, while the affairs of the partnership were wound up by the settlement of accounts of March 30, 1940.

In the assets transferred by the firm to the corporation certain securities then showed a gain in value over their cost, while others showed a loss. The amounts of such capital gains and losses are not in dispute; but the treatment of them with respect to the 1940 income taxes of the thirteen firm members is. In computing the net income of each of the thirteen partners, the Commissioner included the capital gains, but disallowed the capital losses on the basis of I.R.C. § 24(b) (1) (B), 26 U.S.C.A.Int.Rev.Code, § 24(b) (1) (B). Judge Leech, however, in a decision reviewed by the full Tax Court without dissent, held that the section did not prohibit deduction of these losses—being "partnership losses"—and therefore directed their allowance. 8 T.C. 1019. The Commissioner's petitions for review in each of the thirteen cases raise therefore the question as to the appropriate construction of this statutory provision.

For consideration of this question it is not necessary to set forth the details of each partner's interest or of other relevant facts, particularly as they are stated in the opinion below.[1] For all the partners the short-term capital losses aggregated $1,598,871.01; and the long-term capital losses, after applying the percentages applicable in 1940 under I.R.C. § 117 (b), 26 U.S.C.A.Int.Rev.Code, § 117(b),

amounted to $1,230,368.01. The taxpayers' cross-petitions bring up separate issues concerning the disallowance by the Tax Court of losses claimed upon certain securities in default contributed by the firm to the corporation; we shall postpone discussion of this phase of the appeal until later.

■ Sec. 24(b) (1) (B) prohibits any deduction, in computing net income, for losses from sales or exchanges of property—except in the case of distributions in liquidation—between an individual and a corporation whose stock is more than 50 per cent owned by or for him.[2] Our problem is shortly whether this provision includes or excludes partnership holdings. The provision was originally enacted in 1934 as § 24(a) (6) (B); it then included, in addition to the present prohibition, only those between "members of a family." It reached substantially its present form in 1937, § 301, when there were added to the prohibited groups: two personal holding companies with stock ownership of more than 50 per cent in or for the same individual; the grantor and fiduciary of any trust; the fiduciaries of two trusts from the same grantor; the fiduciary and beneficiary of any trust. Among rules for the determination of stock ownership are subds. (B) and (C) of I.R.C. § 24(b) (2), providing that an individual shall be considered as owning "the stock owned, directly or indirectly, by or for his family," and "the stock owned, directly or indirectly, by or for his partner" (the first, B, dating from 1934, and the second, C, from 1937). Further, as is well known, a partnership is not taxable; the individual partners are liable in their individual capacity for both indi-

---

[1] The partners were: J. P. Morgan, Thomas W. Lamont, Junius S. Morgan, George Whitney, R. C. Leffingwell, Francis D. Bartow, Arthur M. Anderson, Thomas S. Lamont, H. P. Davison, Charles D. Dickey, Henry C. Alexander, I. C. Raymond Atkin, and William A. Mitchell. Three of the partners have since died and are now represented by their executors; J. P. Morgan died before the petitions to the Tax Court, while Francis D. Bartow died during their pendency, and Thomas W. Lamont after the filing of the petitions for review.

[2] "§ 24. Items not deductible
"(b) Losses from sales or exchanges of property
"(1) Losses disallowed. In computing net income no deduction shall in any case be allowed in respect of losses from sales or exchanges of property, directly or indirectly—
    *    *    *    *    *    *
"(B) Except in the case of distributions in liquidation, between an individual and a corporation more than 50 per centum in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual.  *  *  *"

vidual income and their respective shares of partnership income computed according to the statutory rules. I.R.C. §§ 181–183, 26 U.S.C.A.Int.Rev.Code, §§ 181–183.

▮▮▮ When these detailed statutory provisions are read against the background of the legislative history and the problem as it was presented to the Congress in 1934, we cannot feel that there can be any serious doubt as to the legislative intent or any substantial ground for believing that Congress intended to leave so large a loophole—almost as large as the one it was trying to close—from its prohibition against deductible losses upon transfers between closely related persons or groups. Indeed, the only thing which would give us pause is the unanimous decision of the Tax Court, whose expert view is always entitled to respectful consideration.[3] We cannot avoid believing that it has become entangled in the jurisprudential aspects of so-called legal "entities" to such an extent as to cause it to overlook the real meaning and purpose of these enactments. In fact they had not then been so authoritatively explained as is now the situation since the more recent decision of the Supreme Court in McWilliams v. C.I.R., 331 U.S. 694, 67 S.Ct. 1477, 91 L.Ed. 1750, 170 A.L.R. 341, which we cite below. The circumstances under which a jural aggregate—admittedly the status of a partnership under the federal revenue laws and the Uniform Partnership Act—may become a jural entity are fascinating in their possibilities for semantic dispute. But this should not be allowed to go so far as to draw all teeth from a statute carefully directed at what the legislative body viewed as the evil of "tax evasion." We may come back to this jurisprudential debate to discuss briefly some of the suggestions urged upon us; but first and most important must be a consideration of the statute itself against its background.

▮ The statute was passed as a part of the dramatic investigations of and legislative attack upon "tax evasion" which developed as a concomitant of the great loss in security values from 1929 on to the date of the legislation. The volume of realized losses in such investments and the question of realization itself provoked legislative attention. For the investigation in which this very firm prominently appeared had brought out that it was possible for taxpayers to go through the form of realization of a loss by a transfer where the economic attributes of ownership were retained. This we pointed out in dealing with the special restrictions made by this same general legislation upon the offset of partnership capital losses against individual capital gains in reversing the deductions allowed in 3 T.C. 1217 to a partner of this firm. Commissioner of Internal Revenue v. Lamont, 2 Cir., 156 F.2d 800, certiorari denied 329 U.S. 782, 67 S.Ct. 203, 91 L.Ed. 671. Whether or not the Congress went further than a fair adjustment of equities would require whether in truth it may be "shocking to the sense of justice," as the taxpayers assert, that capital gains be taxed and losses disallowed, is not for us to say. At least, however, the legislative approach is understandable against this background. But it would hardly be understandable were we to consider the purpose to be to permit just that form of realization of a loss condemned in an individual whenever it was done through the simply added legal device of the partnership, and particularly when this would leave untouched the more spectacular cases which the investigation of the Senate Committee on Banking and Currency had brought to public attention. Commissioner of Internal Revenue v. Lamont, supra, 156 F.2d at page 803.

The only reason for such a differentiation suggested by the Tax Court or by the

[3] Notwithstanding legislative repeal of the rule of Dobson v. C. I. R., 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248, by amendment of I. R. C. § 1141(a) by c. 646, Pub. L. No. 773, 80th Cong., 2d Sess., June 25, 1948, § 36, 26 U.S.C.A.Int.Rev.Code, § 1141(a). While this statute does not become effective until September 1, 1948, our question here, being the interpretation of a statute, is reviewable under McWilliams v. C. I. R., 331 U.S. 694, 67 S.Ct. 1477, 91 L.Ed. 1750, 170 A.L.R. 341; Bingham's Trust v. C. I. R., 325 U.S. 365, 65 S.Ct. 1232, 89 L.Ed. 1670, 163 A.L.R. 1175; New York Stocks v. C. I. R., 2 Cir., 164 F.2d 75; Commissioner of Internal Revenue v. Kohn, 4 Cir., 158 F.2d 32.

taxpayers is the difficulty "of determining the bona fides" of transactions showing large tax losses between members of families and between individuals and the corporations they controlled. No reason is suggested why these difficulties of proof would not be, if anything, increased by the interposition of the partnership device. But the Supreme Court has shown that this is at best an inadequate explanation of the legislation. It says, per Mr. Chief Justice Vinson in the case to which we have already referred: "Moreover, we think the evidentiary problem was not the only one which Congress intended to meet. Section 24(b) states an absolute prohibition—not a presumption—against the allowance of losses on any sales between the members of certain designated groups. The one common characteristic of these groups is that their members, although distinct legal entities, generally have a near-identity of economic interests. It is a fair inference that even legally genuine intra-group transfers were not thought to result, usually, in economically genuine realizations of loss, and accordingly that Congress did not deem them to be appropriate occasions for the allowance of deductions." McWilliams v. C. I. R., supra, 331 U.S. at page 699, 67 S.Ct. at page 1480.

And then the Court goes on to quote from the legislative history of the 1934 legislation to demonstrate that the purpose was this and could not have been to exclude transfers made "through the medium of the Stock Exchange, unless it wanted to leave a loophole almost as large as the one it had set out to close." 331 U.S. at page 701, 67 S.Ct. at page 1481. While the stress in the legislative history is upon what were termed "family losses," there is not the slightest suggestion that the interposition of a partnership would afford a corrective element. Indeed, all the reasoning is to the contrary. H.R.Rep.No.704, Committee on Ways and Means, 73d Cong., 2d Sess., 1939-1 Cum.Bull. (Part 2) 554, 571; Sen. Rep.No.558, Committee on Finance, 73d

Cong., 2d Sess., 1939-1 Cum.Bull. (Part 2) 586, 607. This is emphasized by the statutory language reaching sales "directly or indirectly" between the prohibited groups. Commissioner of Internal Revenue v. Kohn, 4 Cir., 158 F.2d 32.[4] A final clinching demonstration of the legislative intent is found in the 1937 amendments, particularly the provision quoted above from § 24(b) (2) (C) that an individual shall be considered to own stock owned by a partner. The desirability of the change to avoid small differentiations in the coverage of the prohibition is explained in H.R.Rep.No.1546, 75th Cong., 1st Sess., 1939-1 Cum.Bull. (Part 2) 704, 722-724, which also points out that the statutory examples are not exclusive, since the Government can deny losses where the sales are not in fact bona fide. The view taken by the Tax Court therefore requires a differentiation so fine as that between a joint sale made by an individual and his partner and one made by the partnership itself— a differentiation without substance or reality in the light of the legislative purpose. The Tax Court cited the legislative history discussed in Commissioner of Internal Revenue v. Lamont, supra, as supporting special treatment of partnerships; but that exceptional treatment in the particular instance of the extent to which capital gains might be offset by capital losses is strong evidence of unexceptional treatment elsewhere. Indeed, as we there pointed out, citing Neuberger v. C.I.R., 311 U.S. 83, 61 S.Ct. 97, 85 L.Ed. 58, the result was otherwise before the statutory enactment and again after restoration of the earlier law in 1938.

Other provisions of the Internal Revenue Code also appear to us to lend support to the Commissioner's interpretation of the provision here involved. Thus § 3797(a), a section of definitions, goes so far as to provide that, except as otherwise provided or manifestly incompatible with the intent, the term "person" shall be construed to include both an individual and a partnership,

---

[4] In view of the later decision of Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L. Ed. 406, refusing to recognize such a sale to a wholly-owned corporation, even before the statute, the result might perhaps be the same in the absence of statute. See Wickwire v. United States, 6 Cir., 116 F.2d 679; 1 Montgomery's Federal Taxes —Corporations and Partnerships, 1947– 48, 720.

and the term "partnership" includes "a syndicate, group, pool, joint venture, or other unincorporated organization" not a trust or estate or a corporation. Surely one could not avoid the effect of this specific prohibitory legislation by associating himself with a group or pool; nor may the extent of coverage of the act turn upon how far local law treats a joint venture as a partnership. And there is nothing in the Code which seems to us in any way inconsistent with the Commissioner's approach to the problem.

The chief reliance of the Tax Court and of the taxpayers upon this appeal is upon the concept of a partnership as an entity, owning and transferring property apart from its partners. Thus the court cites as apposite that section of the Uniform Partnership Act (effective in New York) which defines a partner's "interest in the partnership" as "his share of the profits and surplus," N.Y.Partnership Law, Consol.Laws, c. 39, § 52, thus overlooking the immediately more apposite provision that the "property rights of a partner" are not only "(b) his interest in the partnership, and (c) his right to participate in management," but also "(a) his rights in specific partnership property." Id. § 50. And the existence of individual rights in specific partnership property is clinched by id. § 51, "A partner is co-owner with his partners of specific partnership property holding as a tenant in partnership," the incidents of this tenancy being thereupon set forth in some five subdivisions. It is a matter of well-understood history (to which we have often referred, as in the cases from this circuit cited below) that the drafters of the act rejected the entity theory for "the common law or aggregate theory." See the authoritative articles by the draftsman, Dean Lewis: The Uniform Partnership Act, 24 Yale L.J. 617, 620; The Uniform Partnership Act, 29 Harv.L.Rev. 158-192, 291-313. Ac-

cordingly the assent of all the partners is necessary in order to dispose of the good will of the business, or to do any act making it impossible to carry on its ordinary business, or to assign a partner's right in specific property of the firm. N.Y.Partnership Law, § 20, par. 3(b, c); § 51, par. 2(b). See Klumpp v. Gardner, 114 N.Y. 153, 21 N.E. 99; Postman v. Rowan, 65 Misc. 50, 119 N.Y.S. 248; Freeman v. Abramson, 30 Misc. 101, 61 N.Y.S. 839. Here the sale to the corporation could not have been validly accomplished without the express assent of the thirteen partners, as, of course, they recognized by joining in the Bill of Sale and Agreement and making the transfer of the assets.

In support of its theory, the Tax Court cited certain of its decisions, including Allan S. Lehman v. Commissioner, 7 T.C. 1088, the affirmance of which in Commissioner of Internal Revenue v. Lehman, 2 Cir., 165 F.2d 383, certiorari denied 68 S.Ct. 1085, has become the main reliance of the taxpayers on this appeal. That case applied the unitary concept of a partnership to the extent of reaching a result which, we agree, was in line with ordinary business conceptions and the there practical statutory intent. There the taxpayer had become a partner in a brokerage firm in 1908 and the question was the valuation of a partnership interest sold by the taxpayer in 1937. The court held, for the purpose of finding the capital gain, that the date of acquisition was 1908, thus rejecting several conflicting theories of the Commissioner: the various dates of purchases of items of firm assets, the date of the last change in personnel by the death of a partner, and so on. Judge L. Hand wrote the opinion: although we have pointed out the general acceptance of the "aggregate" theory in the Uniform Act and the federal taxing statutes in some half dozen or more decisions, most of them written by Judge Hand,[5] these the taxpayers overlook in

[5] Harris v. C. I. R., 2 Cir., 39 F.2d 546; Helvering v. Walbridge, 2 Cir., 70 F.2d 683, certiorari denied 293 U.S. 594, 55 S. Ct. 109, 79 L.Ed. 688; Helvering v. Archbald, 2 Cir., 70 F.2d 720, certiorari denied 293 U.S. 594, 55 S.Ct. 109, 79 L.Ed. 688; Rossmoore v. C. I. R., 2 Cir., 76 F.2d 520;

Helvering v. Smith, 2 Cir., 90 F.2d 590; Williams v. McGowan, 2 Cir., 152 F.2d 570, 162 A.L.R. 1036—all of them written by Judge L. Hand and cited by him in Commissioner of Internal Revenue v. Lehman, supra. The Harris, Rossmoore, Smith, and Williams cases are particularly

their emphasis upon this non-analogous case, which, indeed, had been foreshadowed on its narrow point by earlier cases.[6]

In an acute analysis of the taxation of partnerships it is said that in the broader aspects of partnership law "the Uniform Act has coated the common-law co-ownership theory with a thin veneer of the equity entity concept; but fundamentally, the relationship is defined in terms of rights and obligations of the individual partners. So, too, the tax law adopts the entity concept as a skin deep accounting expedient, but the framework is that of the individual partner's profit and loss." Rabkin and Johnson, The Partnership under the Federal Tax Laws, 55 Harv.L.Rev. 909, 915. And the authors state by way of conclusion: "In too many instances the Treasury and the courts have shied away from the plain implications of the statutory scheme: an income tax imposed upon the partners as individuals. Basically, the tax law adopts the common-law concept of the partnership as an aggregate of individuals operating the properties of the partnership enterprise as co-owners." 55 Harv.L.Rev. at page 949. There is no doubt that generally speaking under the tax law we must approach the partnership as an association of individuals who are co-owners of its specific property and who are taxed, while the partnership is not. However justified we have been in following business practices to treat a share of the firm itself apart from the individual interests, Commissioner of Internal Revenue v. Lehman, supra, we cannot find justification in the precedents and the statute for carrying the rule so far as to apply it by analogy to the ownership of specific property or to disregard the direct specifications of individual ownership of partnership property. Certainly we cannot do so against the background of the statutory provisions when disregard of these precepts would substantially emasculate the legislative prohibition. We conclude that on the Commissioner's petitions the decisions of the Tax Court must be reversed for recomputation of the taxes on the basis of exclusion of these losses.

■ It should be added that the taxpayers make an argument, not presented to the Tax Court, that these losses are within the statutory exception of payments in liquidation of the partnership. There seems a serious question here whether the statutory language of § 24(b) (1) (B) was intended to include more than dividends in liquidation of a corporation. But assuming arguendo that it may apply also to a partnership, it is clear that here the payments were not in liquidation of the partnership, but were the fair consideration for the transfer of assets to the corporation. This was a sale, not a liquidation. Mathews v. Squire, D.C.W.D.Wash., 59 F.Supp. 827.

■ The petitions for review by the taxpayers deal with a different set of facts, which the Tax Court viewed differently. Our decision above on the issue raised by the Commissioner is such as to require affirmance on this point also, although the grounds taken by the Tax Court are in themselves adequate. The facts concern certain securities in default owned by the firm, but whose purchase by a trust company the parties believed to be prohibited by the New York Banking Law, Consol. Laws, c. 2. So the partners tendered, and the corporation accepted, the defaulted securities of the value of $1,472,658, together with cash of $55,073.01, or a total of $1,527,731.01, as a contribution to the corpo-

---

emphatic in their statement of the actual rejection, for good or ill, of the entity theory. See also Benjamin v. Hoey, 2 Cir., 139 F.2d 945, citing Neuberger v. C. I. R., supra; First Mechanics Bank of Trenton v. C. I. R., 3 Cir., 91 F.2d 275; Burnet v. Leininger, 285 U.S. 136, 52 S. Ct. 345, 76 L.Ed. 665; and cf. City Bank Farmers Trust Co. v. United States, 47 F.Supp. 98, 97 Ct.Cl. 296, which was not followed in the Lehman case.

[6] As by the cases that appreciation in a partner's contribution to firm capital cannot be considered realized until liquidation of the firm, as in the Walbridge and Archbald cases, note 5 supra, and Chisholm v. C. I. R., 2 Cir., 79 F.2d 14, 101 A.L.R. 200, certiorari denied Helvering v. Chisholm, 296 U.S. 641, 56 S.Ct. 174, 80 L.Ed. 456, which were discussed and followed in Flannery v. United States, D.C.Md., 25 F. Supp. 677, and Spaid v. United States, D. C.Md., 28 F.Supp. 670, affirmed United States v. Flannery, 4 Cir., 106 F.2d 315.

rate surplus.[7] There were undisputed short-term and adjusted long-term losses over the cost of these assets in excess of two million dollars, but the taxpayers claim only a fractional part thereof, determined by applying a fraction whose denominator is the total contribution just stated and whose numerator is the sum of $856,796.42. This latter figure is the amount of a "Special Reserve" carried by the firm for the purpose of making payments to its retired employees. Since the partners had considered this fund, with its yearly additions from profit and loss, as entirely devoted to this purpose, so that the individual partners claimed no further interest in it even upon retirement from the firm and took contributions to it as deductions in their income tax returns, with the approval of the revenue authorities, the contention is that these assets are charged with a trust or lien to the extent of the reserve and thus losses to a like extent were deductible.

Nevertheless the Tax Court found that the partners had individually made the contribution to the corporation's capital surplus, and that there had been no sale or exchange resulting in a completed transaction showing a realized loss. This is amply supported by the record. The contribution was in fact and in form made by, and accepted from, the partners, and no reference was made to the "Special Reserve." Indeed it is conceded that the corporation in making its opening entries respecting the contributed cash and securities overlooked the "Special Reserve." But in December, 1940, a resolution was passed directing that the sum of $856,796.42 be charged to surplus reserve and credited to the special reserve fund. This transfer was accordingly made on the corporation books. All amounts which had been paid by the corporation to the firm's ex-employees were then charged to the fund, as have been all like payments since. This belated step shows that the contributed securities were not actually subject to a lien or trust and could not be considered more obligated for these payments than any other of the general assets of the firm. As a matter of fact, the corporation had expressly assumed the obligation to pay retirement allowances to these ex-employees by the Bill of Sale and Agreement of March 30, 1940, without mention of or reference to this reserve. Hence both on the ground taken below and the first ground stated in this opinion the taxpayers' appeals must fail.

Finally the taxpayers make an overriding argument of losses to the individual partners upon liquidation of the partnership which is ingeniously audacious. They say that, even if the firm losses are disallowed under § 24(b) (1) (B), nevertheless upon the final winding up and liquidation of the firm on March 30, 1940, each partner sustained a loss measured by the adjusted cost of his interest in the partnership and the amount he received in liquidation. While the Tax Court did not discuss or even state this argument, it did say that losses "were sustained by each of the 13 partners" on the dissolution of the firm, and found the amount of such losses on three alternative hypotheses: (1) on their treatment as ordinary losses; (2) on their treatment as capital losses, with the holding period fixed by the time during which each partner held his partnership interest, and (3) on their treatment as capital losses, with the holding period fixed by the time during which the securities were owned by the firm. On these different hypotheses the losses would run in excess of a total of five million dollars if ordinary losses, and slightly above and slightly under half that amount on each of the other assumptions. It is of course interesting that by the application of the first hypothesis, which the taxpayers have particularly stressed on argument here, losses based upon essentially the same set of facts which we have held disallowed under § 24(b) (1) (B) as capital losses to an amount slightly under three million in total became transmuted into ordinary losses totaling in excess of five million dollars.

---

[7] The cash was added to cause this contribution to balance with certain reserves carried on the partnership books as liabilities, including a General Reserve of $260,173.22, the Special Reserve of $856,796.42 discussed below, and Profit & Loss of $410,761.37—all totaling $1,527,731.01.

■ We do not think such deductions may be made by the individual taxpayers either in the light of the proper construction of § 24(b) (1) (B) or, beyond that, as a proven loss upon the partnership investment. Since the whole basis of the refusal of the deduction under § 24(b) (1) (B) is that the transfer is not such a change of economic interest as to be considered executed or closed to the point of realization of loss to the former owner, there is nothing which would change the prohibition by the added fact, obviously a usual one in the situation, of termination of the partnership. There can be little reason for a transfer in substantial amount of firm assets to a corporation except the substitution of the corporate way of doing business for the former partnership one; and the prohibition of § 24(b) (1) (B), unless it is to be meaningless, must be held to apply then equally or especially. But further, we do not see the basis for finding a partnership loss upon this liquidation in any of the amounts stated.

It may indeed be an interesting question how far such a partnership loss on liquidation, apart from the gains or losses the partner may show on his individual items of property, may be established in any event. The cases cited by the taxpayers are not exactly in point, since they deal with matters such as the time of realization of a gain on a capital contribution or of a loss on a liquidation in kind of the contribution of a limited partner.[8] Of course there may well be gain or loss in items as specific property; indeed § 24(b) (1) (B) then directly applies. Beyond that a partnership voluntarily liquidated can hardly suffer a loss of good will in its change of manner of doing business, since it has taken the step of its own choice and free will, and its new form of operation is seemingly preferable to the parties. If, however, as the taxpayers assume, the process must be one of considering partnership gains and losses over the period of business activity to strike a balance at the end, not only does the operation itself suggest doubts as to its validity, but the business history is here lacking to produce the result. True a final ingenuity of argument is shown in the development of a basis of valuation, for the taxpayers argue that the cost price is the amount received for the assets, plus the losses on the securities transferred under their cost, while the realization price is the liquidating amounts paid the partners.[9] Naturally, the amount of loss turns out to be once more the very loss on the securities themselves.

■ The taxpayers support this result by assuming regularity of proceedings, with proper adjustments of gains and losses, in earlier tax payments, so that at dissolution the partnership situation is properly reflected by the condition of the securities or assets finally disposed of and the receipts therefor and distributions to the partners. Such simplicity of result, leading to a desired, if not already visualized, sum, points to the artificiality of the process. How many problems involving all manner of disallowed losses (as in Commissioner of Internal Revenue v. Lamont, supra) or unadmitted gains as on tax-exempt securities would actually arise on a detailed examination of firm history we can only surmise. It seems clear that, if ever a loss upon an investment in a partnership is to be deducted, it must be based upon a more realistic foundation than the mere deduction of cash distributed from cash received, plus investment losses. As the Commissioner suggests, since all adjustments of the partners' interest or capital account are assumed to have been duly made, his interest at dissolution would always equal his distributive cash. Actually

---

[8] Of the first group are the cases cited in note 6 supra; of the second group are Woodruff v. Commissioner, 38 B. T. A. 739, and Boettcher v. Commissioner, 40 B. T. A. 1379, July 15, 1939, which have not been authoritatively passed upon by appellate courts. See also U. S. Treas. Reg. 103, § 19.113(a) (13)-1 and 2.

[9] As stated above, the amount actually distributed to the partners was $12,210,- 321.08, representing the excess value of assets over liabilities paid them by the corporation of $12,265,394.09, less the cash item of $55,073.01 which they contributed to the corporation, note 7 supra. The partners eventually realized a small additional sum—$30,378.14—on the sale of their interest in Morgan & Cie., of Paris, a French partnership, to Morgan & Cie., Inc., as finally settled in 1945.

any additional loss must be a loss upon some specific property which then is non-deductible under the circumstances here by reason of § 24(b) (1) (B).

Hence on the thirteen petitions for review by the Commissioner, the decisions of the Tax Court will be reversed and the proceedings remanded for recomputation of the various taxes upon the basis of exclusion of losses as directed in this opinion. On the thirteen petitions for review by the taxpayers, the decisions are affirmed.