THE CITY BANK OF WASHINGTON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 90485.   Filed August 23, 1962.

*Karl Riemer, Esq.*, for the petitioner.
*William L. Kinzer, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in the petitioner's income tax for the year 1956 in the amount of $117,753.72 and for the taxable period January 1, 1959, to May 29, 1959, in the amount of $258,838.57.   The year 1956 is here involved solely because of respondent's disallowance of a net operating loss carryback to that year from 1959.   The issues are (1) whether the loss realized by petitioner in the sale of certain United States Treasury obligations is to be recognized, which turns upon whether the sale took place before or after petitioner's adoption of a plan of liquidation under section 337 of the Internal Revenue Code of 1954,[1] and (2) whether a gross receipts tax assessed by the District of Columbia on the gain realized by petitioner on the sale of its assets after the adoption of a plan of liquidation under section 337 is an expense relating to exempt income which is not deductible under section 265.

---

[1] All section references will be to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

714

Some of the facts were stipulated and they are herein included by this reference.

The City Bank of Washington, hereinafter called City Bank or petitioner, is a corporation organized under the laws of Virginia. Its Federal income tax returns for the periods here involved were filed with the district director of internal revenue for the district of Baltimore, Maryland. Except for its concluding fiscal year, City Bank was on a calendar year and it used an accrual method of accounting in maintaining its books of account and in preparing its tax returns.

For many years the City Bank carried on a banking business in the District of Columbia, under the banking laws of said District. Since the close of business on May 29, 1959, City Bank has conducted no business except that incident to its liquidation.

American Security and Trust Company, hereinafter called American Security, is a corporation originally chartered under the laws of Virginia in 1889 and reincorporated in 1890 under the banking laws of the District of Columbia, where it has carried on a banking business at all times material herein. American Security Corporation, hereinafter called the affiliate, is a corporation organized in 1957 under the District of Columbia Business Corporation Act. The stockholders of American Security hold the stock of the affiliate in the same proportions. At all times material herein the affiliate has carried on general business operations in the District of Columbia, primarily in the financial, but nonbanking, field. Robert C. Baker is president of both American Security and the affiliate.

From time to time prior to March 17, 1959, representatives of American Security and the affiliate and representatives of City Bank discussed the possibility of combining American Security and City Bank. American Security desired the combination in order to broaden its base and improve its competitive position in the District of Columbia. At the same time representatives of City Bank were conducting similar discussions with representatives of the Riggs National Bank of Washington, D.C., and this fact was known to the representative of American Security and affiliate. On March 17, 1959, a meeting was held in the offices of Robert C. Baker which, in addition to Baker, was attended by Clarence F. Burton, chairman of the board of directors of City Bank; John C. Pyles, Jr., president of City Bank; Robert G. Merrick, a majority stockholder of City Bank, and William F. Kelly, counsel for City Bank. Burton, Pyles, Merrick, and Kelly together owned or controlled 16,506 shares of the 26,000 shares of outstanding stock of City Bank. In the course of the meeting, Baker, speaking for American Security and the affiliate, stated that American Security and affiliate were prepared to purchase the

stock of City Bank upon a basis which would net the City Bank stockholders $325 per share. Burton, Pyles, Merrick, and Kelly expressed their willingness to accept such an offer and stated that they would recommend its acceptance by the other stockholders of City Bank.

On March 19, 1959, Baker and Thomas D. Carson, vice president of American Security, together with counsel, met with Deputy Comptrollers of the Currency to explain the proposed program for the acquisition of the stock and assets of City Bank, the liquidation of City Bank, and the assumption of its liabilities, and to request expeditious action by the office of the Comptroller of the Currency on such program.

In a letter dated March 20, 1959, and addressed to Burton and Pyles (City Bank), Baker confirmed that, subject to the approval of the boards of directors of American Security and the affiliate, affiliate would offer to promptly purchase all of the 26,000 outstanding shares of City Bank at $325 per share net to each stockholder on certain enumerated terms and conditions. Six stockholders of City Bank affixed their signatures to the letter under the legend "Agreed," committing a total of 17,573 shares of City Bank stock to the proposal.

On March 24, 1959, American Security filed an application with the Comptroller of the Currency for consent to purchase the assets and assume the liabilities of City Bank. On March 24, 1959, the boards of directors of American Security and the affiliate adopted resolutions at special meetings approving the plan to purchase the assets and assume the liabilities of City Bank and authorized certain of their respective officers to take necessary steps for putting the program into effect.

On March 25, 1959, City Bank, American Security, and the affiliate executed a "Basic Memorandum Agreement" which provided that American Security and the affiliate would enter into agreements to purchase all of the assets of City Bank for $8,450,000 and assume all of its liabilities as promptly as possible after the approval of the Comptroller of the Currency had been obtained. The basic agreement further provided that the affiliate would make an offer to purchase all of the 26,000 shares of City Bank stock at a net price of $325 per share.

On April 6, 1959, City Bank and American Security executed a "Purchase and Assumption Agreement" covering the sale of City Bank's banking assets to American Security and the assumption by American Security of the liabilities of City Bank. The agreement provided, in part, as follows:

WHEREAS, Seller [City Bank] intends to cease the transaction of the business for which it was organized and thereafter proceed with the voluntary liquidation of its assets, and dissolution; and

*　　　*　　　*　　　*　　　*　　　*　　　*

EIGHTH: Seller agrees that immediately after the closing date it will proceed to complete its liquidation by distributing its assets and thereupon dissolve.

\*      \*      \*      \*      \*      \*      \*

TENTH: The closing date shall be the close of business of the day on which Seller shall cease to do business preparatory to its liquidation and dissolution, such date to be fixed by the stockholders of Seller.

ELEVENTH: This agreement is subject to the approval of the Plan of Voluntary Dissolution and Complete Liquidation of Seller by a vote of holders of two-thirds (⅔rds) of its stock, and is further subject to the prior approval by the Comptroller of the Currency and his prior consent to the establishment and operation by Purchaser of branch banks at the present locations of Seller.

On April 6, 1959, City Bank and the affiliate executed a similar "Purchase and Assumption Agreement" covering the sale of City Bank's nonbanking assets to the affiliate. The aggregate price to be paid by American Security and the affiliate to City Bank for its assets was $8,450,000 which would give each stockholder of City Bank $325 for each share.

On April 1, 1959, and on April 9, 1959, the Antitrust Division of the Department of Justice requested certain information from American Security about the proposed acquisition of City Bank, and the requested information was supplied to the Department of Justice on April 20, 1959, and April 28, 1959.

Between April 2, 1959, and April 10, 1959, the affiliate purchased 20,500 shares of City Bank from numerous shareholders at a price of $325 per share. In order to finance such purchases in part the affiliate borrowed $6,361,000 from the Guaranty Trust Company of New York. Between April 10, 1959, and May 27, 1959, Alex. Brown and Sons, a firm dealing in securities, puchased 5,277 shares of City Bank stock from numerous stockholders at $325 per share pursuant to an underwriting agreement which had been executed on March 31, 1959.

On May 19, 1959, American Security and the affiliate executed an agreement under which American Security agreed to pay $4,400,170 of the total amount paid for the City Bank assets and the affiliate agreed to pay $4,049,830, such decision being based upon the agreed relative value of the banking and nonbanking assets of City Bank.

On May 26, 1959, the Comptroller of the Currency, in a letter to American Security, consented to the takeover of City Bank, giving as one condition for his approval "That all bonds and securities of the selling bank will be set up on the books of your bank at the market price on the effective date of the takeover." The Comptroller also stated that "It is understood that the proposed purchase of assets and assumption of liabilities of The City Bank of Washington, by your bank, will be presented to the shareholders of The City Bank for ratification on May 29, 1959, and if approved, the proposal will be consummated shortly thereafter."

On May 26, 1959, the portfolio of City Bank included certain United States Treasury bonds and notes which were currently being quoted at less than their cost to City Bank. On that date Baker (president of American Security) and Burton (chairman of the board of City Bank), upon being informed that the letter of approval of Comptroller of the Currency was being dispatched, and of the substance of its contents, consulted with each other and agreed that City Bank should forthwith sell said United States Treasury bonds and notes. Burton immediately arranged for such sale to be made through the Guaranty Trust Company of New York. On that same day the Guaranty Trust Company sold nine issues of United States Treasury bonds and notes for a total sales price of $14,286,081.25. Eight of the issues were sold for a loss and one issue was sold at a gain ($31.25). The net loss realized upon the sale of these nine issues was $583,543.36. Seven issues of United States Treasury obligations were held by City Bank at the close of business on May 26, 1959, and the basis of such obligations held by City Bank was identical to, or lower than, their fair market value or redemption value.

A special meeting of the stockholders of City Bank was called on May 7, 1959, adjourned to May 22, 1959, reconvened on May 22, 1959, and again adjourned to May 29, 1959. At the special meeting held on May 29, 1959, the City Bank stockholders approved the sale of the City Bank assets to American Security and the affiliate and the assumption of the City Bank liabilities by American Security. The stockholders also adopted at the May 29, 1959, meeting a resolution for the voluntary liquidation of City Bank and for the creation of a liquidating committee. The resolutions adopted by the stockholders at the May 29, 1959, meeting stated, in part, as follows:

Resolution No. 1.

STOCKHOLDER RESOLUTION APPROVING PLAN FOR THE SALE BY THE CITY BANK OF ITS ASSETS TO AMERICAN SECURITY AND TRUST COMPANY AND AMERICAN SECURITY CORPORATION, AND THE ASSUMPTION OF ITS LIABILITIES BY AMERICAN SECURITY AND TRUST COMPANY

WHEREAS, the Board of Directors of this Bank by resolution dated March 24, 1959, approved a Basic Memorandum Agreement with American Security and Trust Company (hereinafter called American Security) and American Security Corporation (hereinafter called Affiliate) pursuant to which it was agreed, subject to certain specified conditions, that American Security and Affiliate would enter into Purchase and Assumption Agreements with this Bank providing for the purchase of all the assets of this Bank by American Security and Affiliate and the assumption of all of the liabilities of this Bank by American Security, such purchase to be for a price which will give to each stockholder of this Bank $325 for each share held (i.e., aggregate net price of $8,450,000) ; and

WHEREAS, such Purchase and Assumption Agreements were entered into on April 6, 1959 and are subject to the condition, among others, that stockholders of this Bank holding at least two-thirds (⅔rds) of its outstanding stock should

# 718

first approve of the plan for the liquidation (dissolution) of this Bank as the basis for the purchase of its assets and the assumption of its liabilities;

Now, THEREFORE,

(1) Approval is hereby given to the aforesaid Purchase and Assumption Agreements between this Bank and American Security and between this Bank and Affiliate whereby American Security and Affiliate will purchase all the assets of this Bank and American Security will assume all of its liabilities for a price which will give to each stockholder of this Bank $325 for each share held; and

(2) Approval is hereby given to the plan of voluntary dissolution and complete liquidation of this Bank as proposed at this meeting with the understanding that such liquidation shall be completed within one year of the date hereof.

Resolution No. 2.

### STOCKHOLDER RESOLUTION FOR VOLUNTARY LIQUIDATION

RESOLVED, That The City Bank of Washington be placed in voluntary liquidation (or dissolution), pursuant to law, to take effect at 2:00 P.M. (E.D.T.), May 29, 1959; and

That C. F. Burton, Thomas D. Carson, and Chester B. Sellner be appointed Liquidating Committee of said Bank to serve under the general supervision of the Board of Directors of said Bank.

Resolution No. 3.

### STOCKHOLDER RESOLUTION REGARDING LIQUIDATING COMMITTEE

RESOLVED:

(1) That the Liquidating Committee of this Bank, heretofore appointed, shall be responsible for all liquidating (dissolution) activities of the Bank, and be authorized, either personally or by delegates (including officers of the Bank) duly appointed by such Committee, to execute all necessary deeds and other legal documents, sign checks and otherwise act for the Bank in liquidation;

(2) That any and all action of the Liquidating Committee, taken with the concurrence of any two members thereof, shall constitute the authoritative action of the Liquidating Committee;

    &#9679;        &#9679;        &#42;        &#42;        &#42;        &#42;        &#42;

Resolution No. 4.

### STOCKHOLDER RESOLUTION FOR SALE OF ASSETS AND DISSOLUTION UNDER VIRGINIA LAW

WHEREAS, the Board of Directors of this Bank on March 24, 1959, adopted a resolution recommending that the property and assets of the corporation be sold to American Security and Trust Company and American Security Corporation, and that the corporation be dissolved (or liquidated), and directing that the questions of such sale and dissolution be submitted to a vote at a special meeting of stockholders; and

WHEREAS, a special meeting of stockholders was thereafter called for May 7, 1959, and duly adjourned to May 29, 1959, and due notice of such special meeting, stating that its purpose is to consider the advisability of such sale and dissolution, was on April 10, 1959, given to each stockholder of record;

Now, THEREFORE, BE IT RESOLVED

(1) Such proposed sale of this corporation's assets to American Security and Trust Company and American Security Corporation is hereby authorized and approved, on the terms and conditions and for the consideration heretofore fixed and agreed to by the Board of Directors, as set forth in the Purchase and

Assumption Agreements dated April 6, 1959, with American Security and Trust Company and American Security Corporation, or with such modifications thereof as may be agreed to by the Board of Directors.

(2) Such proposed dissolution of this corporation is hereby approved, which dissolution shall be conducted by the Liquidating Committee designated for such purpose under the general supervision of the Board of Directors and with the full assistance of all the officers of the corporation necessary or available for such purpose; and such officers are hereby authorized to execute and verify the corporation's statement of intent to dissolve and its articles of dissolution, and to take such other and further action as the Liquidating Committee and the Board of Directors shall deem necessary or appropriate to complete the liquidation and dissolution of this corporation.

On May 29, 1959, after the meeting of the City Bank stockholders, American Security accepted an assignment of the banking assets of City Bank and assumed its liabilities, and paid City Bank the sum of $4,921,000. On the same date, after the meeting of the City Bank stockholders, the affiliate accepted an assignment of the nonbanking assets of City Bank and paid City Bank the sum of $3,529,000. In order to raise the funds for such payment, and for other purposes, the affiliate borrowed $3,750,000 from the Guaranty Trust Company of New York.

On May 29, 1959, the liquidating committee of City Bank approved a 100-percent liquidating dividend amounting to $325 per share payable forthwith to the City Bank stockholders. As of the close of business on May 29, 1959, the 26,000 shares of City Bank stock were held as follows: The affiliate, 20,500 shares; Alex. Brown and Sons, 5,277 shares; and 39 miscellaneous shareholders, 223 shares. Beginning May 29, 1959, the liquidating committee paid to the City Bank stockholders who had duly deposited their shares, $325 per share. On May 29, 1959, the affiliate in such manner received $6,662,500, and on the same date the affiliate paid $6,361,000 to the Guaranty Trust Company of New York in repayment of the amounts borrowed by the affiliate in April 1959 to finance its purchases of City Bank stock.

On May 29, 1959, City Bank sent a statement of intent to dissolve to the State Corporation Commisson of Virginia, and on June 16, 1959, filed articles of dissolution with the State Corporation Commission, which approved them on June 19, 1959.

By December 31, 1959, the liquidation of City Bank had been completed, except for the payment of the liquidating distribution of $325 per share in respect of 36 shares of City Bank stock whose owners had not presented the same for payment.

At all times material herein, it was the intention and purpose of the managements of American Security and the affiliate, provided that the affiliate could acquire the requisite number of shares of the stock of City Bank, and further provided that no other circumstances or events intervened to thwart such intention and purpose, to cause

the liquidation of City Bank to be effected; to cause the banking assets of City Bank to be purchased by American Security; to cause the nonbanking assets of City Bank to be purchased by the affiliate; and to cause the liabilities of City Bank to be assumed by American Security. At no time material herein was it the intention or purpose of the managements of American Security or the affiliate, to permit or cause City Bank to be operated indefinitely as a separate banking institution unless circumstances or events intervened which would make such separate operation necessary or desirable. At all times material herein, it was the intention and purpose of the managements of American Security and the affiliate that, if circumstances or events intervened which would make separate operation of City Bank necessary or desirable, the affiliate would hold the stock of City Bank as an investment.

The District of Columbia determined that City Bank realized a gain of $3,867,500 from the sale of its assets to American Security and to the affiliate and that the so-called gross receipts tax on such gain was $154,700, which was duly paid. City Bank claimed this amount as a deduction in its Federal income tax return for the period ended May 29, 1959. Respondent disallowed the deduction in full.

In its Federal income tax return for the period ended May 29, 1959, City Bank claimed a deduction in the amount of $583,543.36 sustained in the sale of certain of its United States Treasury obligations on May 26, 1959. This loss deduction was claimed under section 582(c), which permits banks to deduct such losses as ordinary losses. Respondent disallowed this loss deduction with the following explanation:

(c) The net loss on sale of U.S. Treasury Bonds claimed on your amended final return in the amount of $583,543.36 is disallowed for the reason that the sale of the bonds qualifies for nonrecognition of gain or loss for Federal tax purposes within the provisions of Section 337 of the Internal Revenue Code of 1954.

#### OPINION.

The first issue we must decide is whether the loss of $583,543.36 realized by petitioner on the sale of its United States Treasury obligations on May 26, 1959, falls within the nonrecognition provisions of section 337.[2] This turns upon the date of adoption by the corporation of a plan of liquidation, which is the heart of the dispute between the

---

[2] SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS.

(a) GENERAL RULE.—If—

(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

(2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,

then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

parties. City Bank contends that this date is May 29, 1959, when, at a special meeting of the City Bank stockholders, a plan of complete liquidation was adopted. Respondent argues that "all of the facts and circumstances in the instant case clearly indicate that the plan of liquidation was adopted on or before May 26, 1959."

The avowed purpose of Congress in enacting section 337 was to introduce some certainty in an area where existing court decisions had created disagreements between taxing authorities and taxpayers as to whether sales were made by the corporation or the shareholders depending upon whether such sales were before or after the adoption of a plan of liquidation. S. Rept. No. 1622, 83d Cong., 2d Sess., p. 49. The Senate Finance Committee explained the new section as follows at page 258 of its report:

> Section 337 corresponds in function to section 333 of the House bill and concerns the problems raised by the decisions in *Commissioner* v. *Court Holding Company*, 324 U.S. 451 [331], and *U.S.* v. *Cumberland Public Service Co.*, 338 U.S. 341 [451], and the numerous related cases. These decisions involve the question of whether the corporation or the shareholder effected a sale of property in connection with the liquidation of the corporation. Under the decision in *Cumberland Public Service Co.*, supra, it is indicated that in the case of a distribution of property in liquidation of a corporation followed by its sale made in fact by its shareholders, a single tax is imposed at the shareholder level. Where the shareholders in fact did not effect the sale, tax is imposed both at the corporate and at the shareholder level. Accordingly, under present law the tax consequences arising from sales made in the course of liquidations may depend primarily upon the formal manner in which the transactions are arranged. Your committee intends in section 337 to provide a definitive rule which will eliminate the present uncertainties. * * *

Petitioner readily concedes that a tax advantage was deliberately sought. It sold the bonds it was holding at a book loss because it had substantial income for the first 5 months of 1959 and the bond market was low, and it anticipated the adoption of a plan of liquidation under section 337 that would end its tax year. It had to sell them before adopting the plan of liquidation in order to have the loss recognized.[3]

Respondent's argument seems to be that if a corporation, by shareholder resolution, adopts a plan of complete liquidation, the real date it adopted the plan of liquidation, for the purposes of section 337, is somehow moved back to a date when the adoption of the plan in the near future became likely or even virtually certain.

Respondent's approach would hardly make for certainty. It is to be noted the statute also makes the date of the adoption of the plan important in that such adoption starts the running of the 12-month period within which liquidation distribution must be made. On brief

---

[3] Under a special statutory provision (sec. 582) applicable only to banks net capital losses attributable to sales or exchanges of bonds or other evidences of indebtedness are allowed in full against other income.

respondent candidly admits that "In cases in which the date of adoption of the plan of liquidation is to be determined from all of the facts and circumstances, it is often difficult to pinpoint the exact date of adoption." In fact, respondent makes no attempt to pinpoint such date here but in his brief lists some eight "facts and circumstances" which he contends show "inescapably" that the plan of liquidation was in existence on May 26, 1959. Some of these events took place as early as March 24, 1959, when the board of directors of American Security adopted a resolution which approved the program of acquiring the assets of City Bank and also indicated that City Bank would be liquidated. Certainly this alone would not mean that the plan of liquidation was adopted at that early date, yet it would be as logical to pick that date as it would be to select any of the other seven "facts and circumstances" as the date of adoption of such a plan.

These "facts and circumstances" do nothing more than show that the parties were intending eventually to adopt a plan of liquidation for City Bank. They add nothing for it has been stipulated that "At all times material herein, it was the intention and purpose of the managements of American Security and the Affiliate, provided that the Affiliate could acquire the requisite number of shares of the stock of City Bank, and further provided that no other circumstances or events intervened to thwart such intention and purpose, to cause the liquidation of City Bank to be effected; * * *." The general intention to liquidate is not the adoption of a plan of liquidation.

We can thus agree that on May 26, 1959, when City Bank sold a portion of its United States Treasury obligations at a loss, it did so in anticipation that the City Bank shareholders would in the future adopt a plan of complete liquidation. But this is immaterial for purposes of section 337. In *Virginia Ice & Freezing Corporation*, 30 T.C. 1251, the taxpayer sold a portion of its assets at a loss on October 1 and 4, 1954, and its shareholders did not adopt a plan of complete liquidation until October 22, 1954. We rejected respondent's argument that the directors' anticipation on October 1 and 4, when the assets were sold, that the shareholders would ultimately adopt a plan of liquidation constituted an informal adoption of a plan of liquidation.

Respondent cites *Mountain Water Co. of La Crescenta*, 35 T.C. 418, in support of his position. But that case is clearly distinguishable since the stockholders there never adopted a resolution for a plan of liquidation and, at most, all the stockholders did was consent to the dissolution of the corporation. Absent such formal action, it was necessary for this Court to examine all the facts and circumstances to determine whether or not a plan of liquidation did in fact exist. The other cases cited by respondent are similarly distinguishable.

We hold that City Bank is entitled to a loss deduction of $583,543.36 in its taxable period ending May 29, 1959, realized from the sale of United States Government obligations on May 26, 1959. See sec. 582(c).

The next issue is whether City Bank is entitled to deduct the District of Columbia gross receipts tax imposed on the gain realized from the sale of City Bank's assets, which gain is not recognized under section 337 for Federal income tax purposes. A similar issue was before this Court in *Bertha Gassie McDonald*, 36 T.C. 1108, on appeal (C.A. 5), where we held that Louisiana State income taxes imposed on gains from the sale of assets which were entitled to nonrecognition under section 337 were deductible by the taxpayer. The same result was reached in *Hawaiian Trust Company Limited* v. *United States*, 291 F. 2d 761. These cases are controlling here. We decide this issue for the petitioner.

*Decision will be entered under Rule 50.*