GEORGE L. RIGGS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8348-71.    Filed June 24, 1975.

*Michael Steinberg, Joseph L. Cotter,* and *Edward L. Glazer,* for the petitioner.

*Barry J. Laterman,* for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioner's income tax for the taxable year ended March 31, 1969, in the amount of $589,882.28.

The sole issue for determination is whether the plan of liquidation of Riggs-Young Corp., a subsidiary of the petitioner, was adopted subsequent to the time when petitioner owned at least 80 percent of the outstanding stock of Riggs-Young, thereby rendering section 332, I.R.C. 1954, applicable to the liquidation so that the gain to petitioner thereon is not to be recognized.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

The petitioner, George L. Riggs, Inc. (hereinafter Riggs), is a corporation incorporated in 1927 under the laws of the State of Connecticut with its principal office at the time the petition herein was filed at 89 Logan Street, Springfield, Mass.

The petitioner's taxable year is a fiscal year ending at the last day of March.

Petitioner filed its Federal income tax return for the taxable year ended March 31, 1968, with the District Director of Internal Revenue, Boston, Mass. Petitioner also filed its original Federal income tax return and its amended Federal income tax return for its taxable year ended March 31, 1969, with the District Director of Internal Revenue, Boston, Mass.

At all times relevant to the present case, 97.2 percent of petitioner's issued and outstanding stock was owned by George L. Riggs Trust (hereinafter Riggs Trust). Frances Riggs-Young and the Security National Bank of Springfield, Mass., were the cotrustees of the George L. Riggs Trust during the period in issue. Frances Riggs-Young was a beneficiary of the trust.

The Standard Electric Time Co. (hereinafter Standard) is a liquidated Connecticut corporation formerly with principal offices at 89 Logan Street, Springfield, Mass.

The Standard Electric Time Co. of Delaware (hereinafter Standard of Delaware) and the Standard Electric Time Co. of California (Standard of California) are liquidated Delaware and California corporations, respectively, which were subsidiaries of Standard. Standard of Delaware was a 90-percent-owned subsidiary corporation with Standard owning 90 shares of the

100 issued and outstanding shares. Standard owned 986 shares of the 990 issued and outstanding shares of Standard of California, thereby making it a 99.5-percent-owned subsidiary corporation.

Standard and its two subsidiaries were in the business of manufacturing and marketing electric clocks and signal devices. Standard did the manufacturing and the two subsidiaries marketed its products. Petitioner is a holding company.

Standard, at all times relevant hereto, had 6,840 shares of callable preferred stock issued and outstanding and 11,156 shares of common stock issued and outstanding. Petitioner owned 2,432 shares of Standard's preferred stock (approximately 35.6 percent) and 8,047 shares of Standard's common stock (approximately 72.13 percent). None of the conditions which would have given Standard's preferred shareholders voting power were present during any relevant time period.

Frances Riggs-Young was president and a member of the board of directors of both Standard and petitioner and was also president of Standard of Delaware and vice president of Standard of California. Norman R. Vester, president of the Security National Bank, was, during the relevant period, a member of the board of directors of both Standard and the petitioner.

The corporate charter or bylaws of both Standard and its two subsidiaries required a vote of at least two-thirds of the shares of the corporations entitled to vote to authorize a liquidation of these corporations.

By separate letters dated December 13, 1967, Frances Riggs-Young, in her capacity as president of Standard, notified the common and preferred shareholders of Standard of separate special meetings to be held on December 27, 1967, for each group of shareholders. Both letters stated the purpose of these meetings as follows:

This meeting is called for the purpose of authorizing the sale of substantially all of the Company's assets to a subsidiary of Johnson Service Company for $3,475,000 in cash plus the assumption by the subsidiary of Johnson Service Company of substantially all of the Company's liabilities. In order to permit Johnson's subsidiary to carry on the business under the name "The Standard Electric Time Company", it is proposed to change the name of your Company to Riggs-Young Corporation.

The letters also indicated that an affirmative vote of two-thirds of the outstanding shares of common stock and of two-thirds of the outstanding shares of preferred stock would be necessary to

approve the sale. In addition, the letter to the common shareholders stated:

If the sale of assets is approved and carried out, it is contemplated that during the year 1968 your Company will make an offer to purchase the shares of Common Stock held by all shareholders other than George L. Riggs, Inc.

On December 27, 1967, the common and preferred shareholders of Standard each held special meetings. At the meetings, 10,764 of the 11,156 shares of Standard common stock outstanding and 6,128 of the 6,480 shares of Standard preferred stock outstanding were voted in favor of the sale of assets. The same number of common and preferred were also voted in favor of selling the assets of Standard of Delaware and Standard of California.

On December 29, 1967, substantially all of the assets of Standard and its two subsidiaries, Standard of Delaware and Standard of California, were sold to SET Corp. (hereinafter SET), a Delaware corporation which was a wholly owned subsidiary of Johnson Service Co., a Wisconsin corporation. Neither Standard nor its subsidiaries adopted a plan of complete liquidation pursuant to the provisions of section 337, I.R.C. 1954. The consideration paid by SET for the assets was $3,338,616.55 in cash and the assumption of substantially all of the liabilities of Standard and its two subsidiaries. Of the purchase price, SET paid an aggregate of $3,038,616.55 to Standard and its subsidiaries at the closing. The balance of $300,000 was paid by SET in escrow to the First National Bank of Boston pursuant to an escrow agreement to secure Standard's and its subsidiaries' obligation to indemnify Johnson Service Co. and SET against losses for breaches of warranties, losses caused by liabilities not assumed, and deficiencies in the net worth of the companies acquired.

In connection with this transaction, the names of Standard and its two subsidiaries, Standard of Delaware and Standard of California, were changed to Riggs-Young Corp. (hereinafter Riggs-Young), Riggs-Young Corp. of Delaware (hereinafter Delaware), and Riggs-Young Corp. of California (hereinafter California), respectively.

Riggs-Young and its two subsidiaries, Delaware and California, filed a consolidated Federal income tax return for the taxable

year 1967 with the District Director of Internal Revenue, Boston, Mass.

On January 19, 1968, the board of directors of Riggs-Young voted to call on February 23, 1968, all of its preferred stock at $25 per share. By a letter dated January 23, 1968, the Security National Bank, Springfield, Mass., was given authority to act as agent in the redemption of all of Riggs-Young's issued and outstanding preferred stock.

On February 23, 1968, Riggs-Young, pursuant to the vote of its board of directors at the meeting of January 19, 1968, called for redemption all of the 6,840 shares of preferred stock of the corporation. All 6,840 shares were redeemed by Riggs-Young between February 23, 1968, and April 17, 1968. The 2,432 shares of Riggs-Young's preferred stock owned by petitioner were redeemed on February 23, 1968, and this transaction was reported on the petitioner's Federal income tax return for its taxable year ended March 31, 1968.

The redemption of the preferred stock of Riggs-Young was motivated, in part at least, by the following considerations: (1) The elimination of the requirement for payment of an 8-percent annual dividend on the preferred stock, and (2) the reduction of the number of shareholders with whom Riggs-Young would have to deal.

On April 17, 1968, the board of directors of Riggs-Young held a special meeting and voted to authorize the liquidation of Delaware and California and to vote the stock that Riggs-Young owned in Delaware and California in favor of the liquidation of these corporations. The board also authorized Riggs-Young to make an offer to all of its common shareholders with the exception of George L. Riggs, Inc., and Frances Riggs-Young to purchase such shareholder's common stock for $279 per share and to appoint Security National Bank of Springfield, Mass., as the corporation's agent for receiving and paying for shares tendered by shareholders pursuant to this offer. On April 22, 1968, the shareholders of Delaware and California agreed to the liquidation and dissolution of their respective corporations. Consequently, Delaware and California were each liquidated and their assets were distributed to their shareholders as of June 28, 1968. Frances Riggs-Young, Scott C. Jordan, and Frank F. Whelan each owned 1 share of California's stock at the time it was liquidated.

On April 22, 1968, Scott C. Jordan, secretary of Riggs-Young, wrote a letter on behalf of Frances Riggs-Young to Roger P. Stokey, the attorney representing Frances Riggs-Young, Riggs-Young, and the petitioner in the transactions involved in the instant case, inquiring as to whether Frances Riggs-Young would have to wait for payment for her share of California in view of the fact that she was excluded from the tender offer made by Riggs-Young to its common shareholders.

In a reply letter dated April 23, 1963, Stokey made the following response to Jordan's inquiry:

Mrs. Young runs some tax risk if she accepts a tender offer. Accordingly, we are arranging for her to receive her money in a liquidation. Her share of the California money will be received as a liquidation, so there is no reason for delay. In the case of the Connecticut Company [Riggs-Young], the delay is necessary for tax purposes.

On April 26, 1968, Frances Riggs-Young, in her capacity as president of Riggs-Young, sent a letter to the common shareholders of Riggs-Young, stating an offer by Riggs-Young to purchase all of its outstanding common stock, except those shares held by petitioner and Frances Riggs-Young, at a price of $279 per share payable May 31, 1968. This offer was to expire at the close of business on May 28, 1968. This letter also stated:

If this offer is accepted by substantially all of the stockholders to whom it is directed, the Directors will consider liquidation and final dissolution of the Corporation.

Finally, this letter also noted that the directors of Riggs-Young (other than Frances Riggs-Young) who owned stock in the corporation intended to accept this offer.

At the time Riggs-Young made this offer to purchase its common stock, petitioner owned 8,047 shares or 72.13 percent of Riggs-Young's 11,156 issued and outstanding shares of common stock. Three hundred and sixty-five shares or 3.27 percent of such shares were held by shareholders having beneficial interest in the petitioner (i.e., Frances Riggs-Young owned 346 common shares and George L. Riggs Trust, which owned 97.2 percent of petitioner, owned 19 common shares). The directors (other than Frances Riggs-Young) who were referred to in the offer, owned 66 shares or 0.6 percent of Riggs-Young's common stock. Two thousand six hundred and seventy-eight shares or 24 percent were held by other shareholders.

The tender offer was motivated in part at least by the following: (1) A desire to eliminate minority shareholders who might have different investment objectives or needs from those of the majority shareholder; and (2) a desire to provide the minority shareholders, many of whom were former employees of Standard, the opportunity to receive cash for their shares so they could avoid being locked into a personal holding company. Counsel for petitioner and Riggs-Young also recognized the desirability of petitioner's owning 80 percent of the common stock of Riggs-Young (1) to permit the filing of consolidated returns, and (2) to permit the possible further liquidation of Riggs-Young under section 332 of the Code to simplify the corporate structure.

From the date the tender offer was made, April 26, 1968, until the time it expired on May 28, 1968, 29 owners of 2,738 shares of common stock tendered these shares in response to the offer. Redemption of sufficient shares of common stock to give the petitioner at least 80 percent of the Riggs-Young common stock occurred on May 9, 1968.

By May 28, 1968, 8,418 shares of Riggs-Young common stock were still outstanding and they were owned as follows:

| Owner | Shares | Percent owned |
|---|---|---|
| Frances Riggs-Young | 346 | 4.1 |
| G.L. Riggs Trust | 19 | .2 |
| Petitioner | 8,047 | 95.6 |
| H.F. Smith[1] | 6 | .1 |
| | 8,418 | 100.0 |

[1] The tender offer was subsequently extended beyond May 28 so H. F. Smith, who could not be located prior to said date, could take advantage of it and her shares were tendered on June 25, 1968.

On June 20, 1968, the board of directors and shareholders of Riggs-Young held separate meetings and voted to adopt a plan of complete liquidation and dissolution of the corporation with the liquidating distribution to be completed no later than December 31, 1970.

On or about July 10, 1968, Riggs-Young Corp. filed a Form 966, an information return noting the adoption of the plan of liquidation and dissolution, with the District Director of Internal Revenue, Boston, Mass. The form was accompanied by a certified copy of the resolution of liquidation.

Between June 20, 1968, and December 31, 1968, pursuant to the liquidation of Riggs-Young, the petitioner received

liquidating distributions in the total amount of $2,211,440.03. Said distributions were made up as follows:

| | |
|---|---:|
| Cash | $2,134,092.37 |
| Insurance policies | [1] 76,788.61 |
| Tax refund receivable | 559.05 |
| | 2,211,440.03 |

[1] Terminal reserve value

The cash distribution was received in six separate distributions as follows:

| Date | Amount |
|---|---:|
| 7/11/68 | $643,760.00 |
| 8/5/68 | 478,304.82 |
| 8/30/68 | 478,304.82 |
| 9/30/68 | 478,304.82 |
| 12/9/68 | 48,282.00 |
| 12/27/68 | 7,135.91 |
| | 2,134,092.37 |

Included in the funds distributed in liquidation by Riggs-Young was the $300,000 which had been placed in escrow pursuant to the sale of the assets of Standard (Riggs-Young) and its two subsidiaries. The funds had been released to Riggs-Young in accordance with the terms of the escrow agreement on or shortly before June 30, 1968.

Liquidation and dissolution of Riggs-Young were completed by the end of its 1968 taxable year. Riggs-Young filed its final Federal income tax return with the District Director of Internal Revenue, Boston, Mass.

Petitioner realized a gain of $2,168,975.03 from the liquidation of Riggs-Young, the difference between liquidating distributions in the total amount of $2,211,440.03 and petitioner's basis in the stock of Riggs-Young of $42,465. This gain was reported on the petitioner's Federal income tax return for the taxable year ended March 31, 1969, but not recognized under the provisions of section 332(a), I.R.C. 1954.

## FINDING OF ULTIMATE FACT

Petitioner was the owner of at least 80 percent of the stock of Riggs-Young on the date of the adoption of the plan of liquidation of Riggs-Young.

OPINION

The only question for decision is whether petitioner owned at least 80 percent of the outstanding stock of its subsidiary, Riggs-Young Corp., at the time Riggs-Young Corp. adopted a plan of liquidation within the meaning of section 332, I.R.C. 1954,[1] so that the gain realized by petitioner on the liquidation of Riggs-Young is not to be recognized by virtue of that section. The vital question is when did Riggs-Young adopt a plan of liquidation within the meaning of section 332.

Respondent argues that the plan of liquidation was adopted on December 27, 1967, when about 90 percent of the stock of Riggs-Young (then Standard) was voted in favor of selling substantially all of the assets of Riggs-Young and its two subsidiaries, Delaware and California, to SET; or not later than about April 17, 1968, when the board of directors of Riggs-Young voted to liquidate Delaware and California and to make an offer to purchase all of the common stock of Riggs-Young then outstanding with the exception of the stock owned by petitioner and Frances Riggs-Young.[2]

On the other hand petitioner contends that the plan of liquidation of Riggs-Young was first adopted when it was formally adopted by vote of the stockholders on June 20, 1968, or at the earliest when counsel for petitioner recommended to petitioner in the early days of June 1968 that it liquidate Riggs-Young. Petitioner also contends that section 332 is an elective section and a taxpayer, by taking appropriate steps, can render that section applicable or inapplicable.

The parties are in agreement that by May 9, 1968, petitioner was the owner of at least 80 percent of the outstanding stock of Riggs-Young.

Section 332(a) of the Code provides as a general rule: "No gain or loss shall be recognized on the receipt by a corporation of property distributed in complete liquidation of another corporation." Subsection (b)[3] of section 332 establishes certain

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

[2] Respondent specifically does not rely on the "end-result" or "step-transaction" theory in this case. See *Granite Trust Co. v. United States,* 238 F. 2d 670 (1st Cir. 1956); *Estate of E. Brooks Glass, Jr.,* 55 T.C. 543, 569, affd. per curiam 453 F. 2d 1375 (5th Cir. 1972).

[3] SEC. 332. COMPLETE LIQUIDATIONS OF SUBSIDIARIES.

  (b) LIQUIDATIONS TO WHICH SECTION APPLIES.—For purposes of subsection (a), a distribution shall be considered to be in complete liquidation only if—

    (1) the corporation receiving such property was, on the date of the adoption of the

requirements which must be satisfied before subsection (a) becomes applicable. The only requirement of subsection (b) which is in issue in this case is whether petitioner, which received property from Riggs-Young in liquidation, was, on the date of the adoption of the plan of liquidation, the owner of at least 80 percent of the stock of Riggs-Young, the liquidating corporation.

Nowhere in the pertinent statute is the phrase "the date of the adoption of the plan of liquidation" defined. However, in attempting to define this phrase for purposes of the provision of section 337, the regulations of the Commissioner provide:

Ordinarily the date of the adoption of a plan of complete liquidation by a corporation is the date of adoption by the shareholders of the resolution

---

plan of liquidation, and has continued to be at all times until the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends); and either

(2) the distribution is by such other corporation in complete cancellation or redemption of all its stock, and the transfer of all the property occurs within the taxable year; in such case the adoption by the shareholders of the resolution under which is authorized the distribution of all the assets of such corporation in complete cancellation or redemption of all its stock shall be considered an adoption of a plan of liquidation, even though no time for the completion of the transfer of the property is specified in such resolution; or

(3) such distribution is one of a series of distributions by such other corporation in complete cancellation or redemption of all its stock in accordance with a plan of liquidation under which the transfer of all the property under the liquidation is to be completed within 3 years from the close of the taxable year during which is made the first of the series of distributions under the plan, except that if such transfer is not completed within such period, or if the taxpayer does not continue qualified under paragraph (1) until the completion of such transfer, no distribution under the plan shall be considered a distribution in complete liquidation.

If such transfer of all the property does not occur within the taxable year, the Secretary or his delegate may require of the taxpayer such bond, or waiver of the statute of limitations on assessment and collection, or both, as he may deem necessary to insure, if the transfer of the property is not completed within such 3-year period, or if the taxpayer does not continue qualified under paragraph (1) until the completion of such transfer, the assessment and collection of all income taxes then imposed by law for such taxable year or subsequent taxable years, to the extent attributable to property so received. A distribution otherwise constituting a distribution in complete liquidation within the meaning of this subsection shall not be considered as not constituting such a distribution merely because it does not constitute a distribution or liquidation within the meaning of the corporate law under which the distribution is made; and for purposes of this subsection a transfer of property of such other corporation to the taxpayer shall not be considered as not constituting a distribution (or one of a series of distributions) in complete cancellation or redemption of all the stock of such other corporation, merely because the carrying out of the plan involves (A) the transfer under the plan to the taxpayer by such other corporation of property, not attributable to shares owned by the taxpayer, on an exchange described in section 361, and (B) the complete cancellation or redemption under the plan, as a result of exchanges described in section 354, of the shares not owned by the taxpayer.

authorizing the distribution of all the assets of the corporation (other than those retained to meet claims) in redemption of all of its stock. * * * [Sec. 1.337-2(b), Income Tax Regs; accord, *Virginia Ice & Freezing Corp., 30 T.C. 1251 (1958).]*

The date of this shareholder resolution should ordinarily be considered the date of the adoption of the plan of liquidation for purposes of section 332. See sec. 332(b) (2).

This Court has noted, in interpreting section 112(b) (6), I.R.C. 1939 (the predecessor of section 332, I.R.C. 1954), that although the adoption of the plan of liquidation "need not be evidenced by formal action of the corporation or the stockholders. * * * even an informal adoption of the plan to liquidate presupposes some kind of definitive determination to achieve dissolution." *Distributors Finance Corp.,* 20 T.C. 768, 784 (1953). The mere general intention to liquidate is not the adoption of a plan of liquidation. *City Bank of Washington,* 38 T.C. 713 (1962).

Based on the evidence introduced in the case at bar, we must conclude that a plan for the liquidation of Riggs-Young had not been adopted prior to the critical date of May 9, 1968.

Respondent, in an effort to show that the plan of liquidation of Riggs-Young was informally adopted on December 27, 1967, or no later than April 1968, alludes to actions and statements made in connection therewith taken between December 1967 and June 1968. Petitioner offered the testimony of persons involved in those actions to explain what the parties had in mind in taking those actions and making the statements which cast a quite different light on the reasons therefor. This testimony was creditable and not shaken by cross-examination. In light of such evidence, we cannot agree with respondent's inference that these actions constituted an informal adoption of a plan of liquidation of Riggs-Young prior to May 9, 1968.

Respondent argues that the letter dated December 13, 1967, sent to the common shareholders of Standard (Riggs-Young) notifying them of the proposed sale of its assets and that the corporation was contemplating an offer to purchase the common shares held by all shareholders other than petitioner if the sale was approved, clearly indicates that the shareholders at the meeting on December 27, 1967, intended to approve not only the sale of the assets, but also the liquidation of Standard (Riggs-Young).

We believe this infers too much. As petitioner points out, the use of the word "contemplated" shows the acquisition of the common stock of the minority shareholders was merely a possibility about which a final decision had not been made. In any event, from the possibility of a tender offer to the minority shareholders, we cannot conclude, ipso facto, that a plan for the liquidation had been adopted. Petitioner explained that the possibility of this tender offer was made known to the shareholders in order to avoid any possible disclosure problem with the securities law and to apprise the shareholders, from a fairness standpoint, of eventual possibilities resulting from the sale. This explanation is reasonable.

Respondent next points to the fact that on February 23, 1968, all of the 6,840 shares of preferred stock of Riggs-Young were called for redemption as additional evidence that a definite decision to liquidate the corporation had been made. We believe petitioner adequately explained that this redemption was based on sound business reasons. The preferred stock had a par value of $25 per share and a cumulative dividend of 8 percent. This stock was subject to redemption at the option of Riggs-Young upon payment of the par value and any accumulated dividend. The testimony of Norman Vester, a director of Riggs-Young and president of Security National Bank which was cotrustee of Riggs Trust, and Roger Stokey, the attorney for petitioner, Riggs-Young, and Frances Riggs-Young, reveal that the redemption of the preferred stock was motivated by the desire to eliminate the excessive burden of a cumulative dividend of 8 percent and to reduce the number of shareholders with whom Riggs-Young and National Security Bank, as cotrustee of the majority shareholder, would have to deal. Both Vester and Stokey testified that as of January 19, 1968, the date the board of directors of Riggs-Young voted to redeem the preferred stock, no decision had been made to liquidate the corporation, and, therefore, no plan had been adopted.

Respondent next claims that a letter dated April 23, 1968, from Stokey to Scott C. Jordan categorically shows that a plan to liquidate Riggs-Young had been adopted prior to the date of the letter. Stokey's letter was in response to a letter from Jordan on behalf of Frances Riggs-Young inquiring whether she could participate in the tender offer that was about to be made to the minority shareholders of Riggs-Young. In his letter, Stokey said

that Frances Riggs-Young might run some tax risks if she accepted a tender offer by Riggs-Young, apparently basing this statement on his belief that the amount she received from a tender offer might be taxed to her at ordinary income rates. As a result of this potential risk, Stokey stated in the letter: "Accordingly, we are arranging for her to receive her money in a liquidation."

Respondent perceives this statement by Stokey as a clear indication that a plan of liquidation of Riggs-Young had been adopted by a definite decision by April 23, 1963. We cannot so conclude. Stokey testified that the "we," referred to as arranging the liquidation, meant Stokey and another member of his law firm, William Gorham. This letter merely shows that the attorneys involved in these transactions were contemplating the possibility of a liquidation of Riggs-Young. It in no way proves that the directors or shareholders of the corporation had made a definite decision or informally adopted a plan of liquidation.

Finally, respondent views the letter dated April 26, 1968, drafted by Frances Riggs-Young as president of Riggs-Young, which contained the tender offer to the common shareholders, other than petitioner and Frances Riggs-Young, as an additional indication of a prior adoption of a plan to liquidate. In this letter, Frances Riggs-Young did state that if substantially all of the shareholders accepted the offer, the directors of the corporation would consider liquidation and final dissolution of Riggs-Young.

Stokey testified that Gorham and he inserted, in this April 26 letter, the reference to the possible consideration of liquidating Riggs-Young. He also candidly admitted that he had undoubtedly discussed the possibility of liquidation of Riggs-Young at some prior point with Frances Riggs-Young, but hastened to add that he neither recommended liquidation at this time nor did she direct steps be taken to liquidate. Further, Stokey testified that he would never have recommended liquidation of Riggs-Young if petitioner had failed to achieve the 80-percent ownership.

Petitioner contends that the tender offer to the minority shareholders was made solely for business considerations and not with an eye toward the eventual liquidation of Riggs-Young. Vester and Stokey both testified that since the assets of Riggs-Young had been exchanged for cash, the primary purpose of the tender offer was to eliminate minority shareholders who might

have different investment objectives for this cash than the majority shareholder. The bank, as trustee of Riggs, did not want to have to deal with a large group of minority shareholders. Furthermore, Stokey testified that Frances Riggs-Young desired to have the minority shareholders, many of whom were former employees of Standard, receive cash for their stock rather than have them remain locked in as minority shareholders of a personal holding company.

Stokey testified that another objective of the tender offer was to increase petitioner's ownership of Riggs-Young to 80 percent thereby enabling them to file a consolidated return. According to petitioner, the ultimate liquidation of Riggs-Young was not motivated by tax considerations and the sole advantage to be achieved from the liquidation was the simplification of petitioner's corporate structure. Petitioner alleges that Riggs-Young could have been kept in existence without any tax disadvantage. In fact the liquidation of Riggs-Young actually resulted in a tax disadvantage to Frances Riggs-Young personally since she had to pay capital gains tax on her share of the liquidation proceeds. She was a wealthy woman in her seventies and not in need of these funds and could have left this money in corporate solution until her death to enable it to receive a stepped-up basis for the beneficiaries of her estate.

We believe petitioner's explanations of why the actions were taken and the statements were made are true and that the considerations mentioned were taken into account in making the decisions that followed. While the motives enumerated by petitioner do not directly negate the notion that a liquidation may have been contemplated, discussed, or even intended prior to May 9, 1968, they do serve to sufficiently undermine the conclusions drawn by respondent from the actions and statements to offset any presumptions that respondent's inferences are correct. Without more concrete evidence than we have before us, we cannot agree with respondent that a plan of liquidation of Riggs-Young was adopted within the meaning of section 332 prior to May 9, 1968. Lacking such a finding, we believe the date on which the resolution to liquidate was actually adopted by the shareholders should be controlling.

The very most that can be gleaned from the evidence favorable to respondent's contention is that there may have been a general intent on the part of petitioner's advisers somewhere along the

line prior to May 9, 1968, to liquidate Riggs-Young when and if petitioner achieved 80-percent ownership of Riggs-Young stock as a result of the tender offer. However, the formation of a conditional general intention to liquidate in the future is not the adoption of a plan of liquidation. *City Bank of Washington, supra.*

A mere intent by a taxpayer-corporation to liquidate a subsidiary prior to meeting the 80-percent requirement of section 332 should not be tantamount to the adoption of a plan of liquidation for the subsidiary at the point in time when that intent is formulated or manifested. Such a result would thwart the congressional intent of section 332 and prior judicial interpretations of this section and its predecessor.

The predecessor of section 332, I.R.C. 1954, was section 112(b)(6), first enacted in 1935. The purpose of section 112(b)(6) was to encourage the simplification of corporation structures and allow the tax-free liquidation of a subsidiary. *J. C. Penney Co.*, 37 T.C. 1013, 1021 n.21 (1962), affd. 312 F. 2d 65 (2d Cir. 1962).

Under section 112(b)(6), the parent corporation not only was required to own at least 80 percent of the stock of the subsidiary from the date of adoption of the plan of liquidation until the property was received (as still required by section 332), but also was forbidden to dispose of any stock between the date of adoption and the time of the receipt of the property. The courts in interpreting section 112(b)(6) determined that a taxpayer could remove itself from the provision of that section by taking the appropriate steps of either intentionally reducing its stock ownership below 80 percent prior to the actual adoption of a liquidation plan or disposing of a small amount of stock between the date of adoption and the time the distributed property was received. *Granite Trust Co. v. United States,* 238 F. 2d 670 (1st Cir. 1956); *Commissioner v. Day & Zimmermann,* 151 F. 2d 517 (3d Cir. 1945); *Avco Manufacturing Corp.,* 25 T.C. 975 (1956). See *Madison Square Garden Corp.,* 58 T.C. 619 (1972), affd. in part and revd. in part 500 F. 2d 611 (2d Cir. 1974).

In *Granite Trust Co. v. United States, supra,* the circuit court concluded that section 112(b)(6) was inapplicable and based this decision on the fact that the corporation disposed of stock in violation of the second requirement of section 112(b)(6) (subsequently deleted from section 332, I.R.C. 1954). The court

reached this decision even though the corporation had made the dispositions in an attempt to avoid the application of this section. The court then traced this section into the 1954 Code stating at pages 676-677:

Now, what did the Congress do in 1954 in view of Commissioner of Internal Revenue v. Day & Zimmermann, Inc., holding that a parent corporation contemplating the liquidation of a wholly owned subsidiary might elect, by making a transfer of an appropriate portion of the stock in the subsidiary, to avoid the conditions precedent to the nonrecognition of gain or loss prescribed in § 112(b)(6)? In reenacting that section in 1954, the Congress struck out the second condition, but left in the first condition which the taxpayer had successfully utilized in the Day & Zimmermann case in order to avoid a nonrecognition of a realized loss. This is what the Report of the Senate Finance Committee said at the time:

"Section 332. Complete Liquidations of Subsidiaries.

"Except for subsection (c) section 332 corresponds to and in general restates section 112(b)(6) of the 1939 Code and provides for the liquidation of a subsidiary corporation by its parent without the recognition of gain or loss to the parent corporation. Your committee has, however, deleted a provision which now appears in section 112(b)(6)(A) which removes a liquidation from the application of that section if the parent corporation at some time on or after the time of the adoption of the plan of liquidation and until the receipt of the property owns more stock than that owned at the time of the receipt of the property. Your committee has removed this provision with the view to limiting the elective features of the section." (Sen. Finance Committee Report, H.R. 8300, 83d Cong., 2d Sess. 255 (1954).)

The above reference to the "elective features" of the subsection seems inescapably to reflect a legislative understanding (admittedly not contemporaneous with enactment, however) that taxpayers can, by taking appropriate steps, render the subsection applicable or inapplicable as they choose, rather than be at the mercy of the Commissioner on an "end-result" theory. Nowhere in the subsection is there any express reference to an "election" or an "option," and the use of the word "elective" in the committee report therefore strongly indicates, as the taxpayer argues, that the committee believed that corporations could avoid the nonrecognition provisions by transfers designed to eliminate the specific conditions contained in the subsection.

Based on legislative history of this section and prior judicial decisions, we conclude that section 332 is elective in the sense that with advance planning and properly structured transactions, a corporation should be able to render section 332 applicable or inapplicable. The Commissioner in his regulations has conceded corporations this power in a seemingly analogous situation. See sec. 1.337-2(b), Income Tax Regs.

Such power of planning presupposes some right to forethought and the accompanying intent to achieve the desired goal. It would

be a logical inconsistency equivalent to a "Catch-22" to say that a corporation has the power to control the application of this section, but that once the corporation formulates the intent to do so (assuming that at or subsequent to the time the intent was formed, it owned less than the required 80 percent but enough stock to cause the liquidation of the subsidiary), it has adopted a plan of liquidation and has precluded itself from the section.

A basic tenet of our tax laws is that a taxpayer has the legal right to decrease or altogether avoid his taxes by means which the law permits. *Gregory v. Helvering*, 293 U.S. 465 (1935); *Daniel D. Palmer*, 62 T.C. 684 (1974). At most, petitioner did no more than follow this prerogative.

The shareholders of Riggs-Young formally adopted the plan of liquidation of the corporation on June 20, 1968. Stokey testified that based on the records contained in his office diary, he did not discuss definite liquidation of the corporation with the corporate officers prior to June 4, 5, or 6, 1968. He concluded that he recommended liquidation on either the 4th or 5th of June 1968, and that a definite decision to liquidate was probably made on June 6, 1968. The testimony of Vester corroborates these statements of Stokey. We recognize that the adoption of a plan of liquidation need not be evidenced by formal action of the corporation or shareholders, *Distributors Finance Corp., supra.* In this case, however, we find on the evidence that the plan of liquidation was adopted when the formal action was taken on June 20, 1968. Furthermore, even if it can be said that a plan of liquidation was adopted when Stokey first recommended it to the management, see *Distributors Finance Corp., supra*, this occurred in June 1968 and would satisfy the requirements of section 332.

Respondent has cited and relied on Rev. Rul. 70-106, 1970-1 C.B. 70,[4] as supportive of his position. This Court is not bound by

---

[4] Rev. Rul. 70-106

Minority shareholders owned twenty-five percent of the capital stock of corporation X. The remaining seventy-five percent of the capital stock of X was owned by Corporation Y. Y desired to liquidate X in a transaction to which section 332 of the Internal Revenue Code of 1954 would apply in order that Y would recognize no gain on the transaction. The minority shareholders agreed to have their stock of X redeemed. Following the distribution to the minority shareholders, Y owned all the stock of X. Y then adopted a formal plan of complete liquidation of X and all of the remaining assets of X were distributed to Y.

*Held*, all of the shareholders of X received a distribution in liquidation under the provisions of section 331 of the Code, and the gain is recognized to Y and gain or loss is recognized to the minority shareholders under section 331 of the Code. The liquidation fails to meet the eighty percent stock ownership requirements of section 332(b)(1) of the

a revenue ruling. *Andrew A. Sandor,* 62 T.C. 469 (1974). In addition, we find the facts of this case are greatly dissimilar to those contained in the ruling. The ruling assumes a prior agreement between the minority and majority shareholders concerning the redemption of the minority stockholders' stock. The ruling concludes that the liquidation plan was adopted when this agreement was reached. In the case at bar, there is no evidence of an agreement between the minority and majority shareholders prior to the tender offer. *Madison Square Garden Corp., supra* at 624 n.4. Since this revenue ruling is inapplicable, proper judicial restraint dictates that we do not comment on the validity or invalidity of the ruling as limited to the facts contained therein. *Ronald C. Packard,* 63 T.C. 621 (1975).

*Decision will be entered for the petitioner.*

Reviewed by the Court.

---

Code since the plan of liquidation was adopted at the time Y reached the agreement with the minority shareholders and at such time, Y owned seventy-five percent of the stock of X.

