**ASSOCIATED WHOLESALE GROCERS, INC., and its subsidiary, Super Market Developers, Inc., Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 89–3287.

United States Court of Appeals, Tenth Circuit.

March 15, 1991.

**1518**

Joel B. Voran (H. David Barr, with him on the briefs), Gage & Tucker, Overland Park, Kan., for plaintiffs-appellants.

Kimberly S. Stanley (Benjamin L. Burgess, Jr., U.S. Atty., Topeka, Kan., Shirley D. Peterson and Gary R. Allen, with her on the briefs), Dept. of Justice, Washington, D.C., for defendant-appellee.

Before SEYMOUR, MOORE and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

Associated Wholesale Grocers, Inc. and its wholly-owned subsidiary, Super Market Developers, Inc. (collectively, "taxpayer"), appeal the district court's order denying their motion for summary judgment and granting summary judgment in favor of the Internal Revenue Service ("IRS"). Taxpayer seeks to recognize a business loss and claim a refund of federal income taxes. *See Associated Wholesale Grocers, Inc. v. United States*, 720 F.Supp. 887 (D.Kan.1989).

### Background

The material facts are not in dispute. In 1976, Super Market Developers, Inc. ("Super Market Developers") made a tender offer for all of the outstanding stock of Weston Investment Co. ("Weston"), a publicly traded holding company which owned a number of corporate supermarkets. Super Market Developers acquired approxi-

mately 99.97 percent of the total outstanding shares of Weston by 1980. The management of Super Market Developer's parent corporation, Associated Wholesale Grocers, Inc. ("Associated Grocers"), subsequently decided it was not in their best interests to own and operate grocery stores through subsidiary corporations. *Grocers,* 720 F.Supp. at 888.

One of Weston's subsidiaries was Weston Market, Inc. ("Weston Market"), a grocery managed by Thomas Elder. In 1980, Mr. Elder expressed to taxpayer his interest in buying Weston Market. Taxpayer advised Mr. Elder that it was not interested in a transaction solely involving the stock or operating assets of Weston Market, but that it would be willing to continue discussions.

The parties eventually structured a disposition of Weston's stock which, taxpayer hoped, would enable it both to cash out Weston's minority shareholders without paying a premium and to recognize a substantial loss in the value of Weston's assets [1] when it sold Weston Market. The transaction took the form of two agreements between Super Market Developers and Elder Food Mart, Inc. ("Elder, Inc."), a corporation organized by Mr. Elder to facilitate the purchase of Weston Market. Both agreements were signed on December 11, 1980, and consummated on December 23, 1980.

Under the "Agreement and Plan of Merger," Weston was merged into Elder, Inc., with Elder, Inc. as the surviving corporation. Elder, Inc. exchanged $300,000 in cash and a non-interest bearing demand promissory note, with a face value of $9,049,703, for the Weston stock. The minority shareholders were entitled to receive $28.50 per share, or more, depending on their pro rata share of the cash and note exchanged for Weston stock.

Under the "Agreement and Plan of Reorganization," which took effect "immediately following the time of effectiveness of

---

**1.** Taxpayer was concerned by the difference between Super Market Developer's cost basis in the Weston stock—the amount it had paid for the stock, $11,727,716—and the carryover basis representing the market value of Weston's assets, $9,374,458. Under I.R.C. § 334, taxpayer would get the carryover basis for Weston's assets upon a complete liquidation of Weston.

the merger", Super Market Developers bought back all the assets acquired by Elder, Inc. under the merger agreement except for the stock of Weston Market. In exchange for those assets, Super Market Developers paid "an amount equal to the principal amount of the promissory note ... plus an amount equal to the cash received by the [minority] shareholders."

Taxpayer treated the transaction as a taxable sale of Weston's assets and declared a tax loss under I.R.C. § 1001(a)[2] Because the transaction brought Super Market Developers $2,353,258 less than its cost basis in the stock of Weston, the taxpayer reported that amount as a long-term capital loss in its 1980 consolidated federal income tax return and sought to carry back portions of the loss to each of the three prior years. The IRS denied the loss, concluding the transaction was not a sale but rather a complete liquidation of taxpayer's subsidiary, Weston. As such, the IRS concluded, recognition of the loss was barred by I.R.C. § 332.[3] The IRS assessed a deficiency which the taxpayer paid.

Upon the IRS's denial of taxpayer's claim for refund, taxpayer filed suit in the United States District Court for the District of Kansas. The district court applied the step transaction doctrine in holding that § 332 bars the recognition of taxpayer's loss. *Grocers*, 720 F.Supp. at 890. The court granted summary judgment in favor of the government. *Id.* This appeal followed.

Our review of the district court's grant of summary judgment is de novo. *Anderson v. HHS*, 907 F.2d 936, 946 (10th Cir.1990). The government and taxpayer agree the pertinent facts are undisputed. As this case involves "no genuine issue as to any material fact" (Fed.R.Civ.P. 56(c)), summary judgment is appropriate. Our task is to determine which party—the taxpayer or the government—"is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c).

---

2. I.R.C. § 1001. Determination of amount of and recognition of gain or loss

(a) Computation of gain or loss
The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.
. . . .
(c) Recognition of gain or loss
*Except as otherwise provided in this subtitle,* the entire amount of the gain or loss, determined under this section, on the sale or exchange of property shall be recognized.
I.R.C. § 1001 (1989) (emphasis added).

3. § 332. Complete liquidation of subsidiaries
(a) General rule
No gain or loss shall be recognized on the receipt by a corporation of property distributed in complete liquidation of another corporation.
(b) Liquidations to which section applies
For purposes of subsection (a), a distribution shall be considered to be in complete liquidation only if—
(1) the corporation receiving such property was, on the date of the adoption of the plan of liquidation, and has continued to be at all times until the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends); and either
(2) the distribution is by such other corporation in complete cancellation or redemption of all its stock, and the transfer of all the property occurs within the taxable year; in such case the adoption by the shareholders of the resolution under which is authorized the distribution of all the assets of such corporation in complete cancellation or redemption of all its stock shall be considered an adoption of a plan of liquidation, even though no time for the completion of the transfer of the property is specified in such resolution; or
(3) such distribution is one of a series of distributions by such other corporation in complete cancellation or redemption of all its stock in accordance with a plan of liquidation under which the transfer of all the property under the liquidation is to be completed within 3 years from the close of the taxable year during which is made the first of the series of distributions under the plan, except that if such transfer is not completed within such period, or if the taxpayer does not continue qualified under paragraph (1) until the completion of such transfer, no distribution under the plan shall be considered a distribution in complete liquidation.
I.R.C. § 332 (1954).

### Arguments on Appeal

The issue presented is whether, as a matter of law, the transaction of December 23, 1980 constitutes a taxable sale or other disposition of Weston's assets under I.R.C. § 1001(a) or a non-taxable complete liquidation of Weston under I.R.C. § 332.

Taxpayer argues the district court erred in accepting the government's characterization of the transaction as a non-taxable liquidation under § 332, and in applying the step transaction doctrine to reach that conclusion. Taxpayer advances five reasons in support of its argument: (1) the transaction does not meet the enumerated requirements of § 332; (2) case law rejects application of the step transaction doctrine in the § 332 context; (3) this transaction was supported by business purposes which bar application of the step transaction doctrine; (4) even if it is applicable, the step transaction doctrine was improperly applied by the district court; and (5) application of the step transaction doctrine in this case will produce the harsh result of forever depriving taxpayer of the recognition of its tax loss. We now address those contentions.

### I. Internal Revenue Code § 332

Section 332 states an exception to the general rule of recognition which is applicable to gains or losses realized in corporate liquidations. "Generally, distributions in complete liquidation of a corporation, other than the liquidation of a subsidiary qualifying under Section 332, are taxable to the shareholder under Section 331 to the extent the fair market value of the distributions exceed[s] the basis of the shareholder's stock." 11 J. Mertens, *The Law of Federal Income Taxation* § 42.01 at 3 (1990). "Section 332 excepts from the general rule property received, under certain specifically described circumstances, by one corporation as a distribution in complete liquidation of the stock of another corporation and provides for the nonrecognition of gain or loss in those cases which meet the statutory requirements." Treas.Reg. § 1.332–1 (1955). The purpose of the exception is to facilitate simplification of corporate struc-

tures. *Cherry–Burrell Corp. v. United States,* 367 F.2d 669, 674 (8th Cir.1966).

The nonrecognition exception of § 332 applies or, in other words, a distribution is considered to be in complete liquidation of a subsidiary, only if:

(1) the asset-receiving or "parent" corporation owns, on the date of the adoption of the plan of liquidation and continuously until the receipt of the assets upon liquidation, at least 80 percent of the total voting power and value of the subsidiary (§ 332(b)(1)); and

(2) the subsidiary distributes its property in complete cancellation or redemption of its stock (§ 332(b)(2), (3)); and

(3) the subsidiary transfers all of its property to the parent either:

(a) within the taxable year (in which case the shareholders' adoption of the resolution authorizing the distribution of assets in complete cancellation or redemption of stock is considered an adoption of a plan of liquidation) (§ 332(b)(2)), or

(b) in a series of distributions in accordance with a plan of liquidation under which all property is distributed within three years from the close of the year in which the first distribution is made. (§ 332(b)(3).)

*See* I.R.C. § 332(b)(1)–(b)(3); 11 J. Mertens, *The Law of Federal Income Taxation,* § 42.42 at 113–14 (1990); *cf. Matter of Chrome Plate, Inc.,* 614 F.2d 990, 994 (5th Cir.) *cert. denied,* 449 U.S. 842, 101 S.Ct. 123, 66 L.Ed.2d 50 (1980).

The significance of the statute in this dispute is apparent: if § 332 applies, taxpayer cannot recognize its loss. If § 332 is inapplicable, however, taxpayer is entitled to a substantial tax refund.

Taxpayer argues § 332 is inapplicable for three reasons: the 80 percent ownership requirement was not continuously met; all of the assets of the subsidiary were not transferred to the parent; and taxpayer did not adopt a plan of liquidation. We will consider these arguments in turn.

## II. 80% Stock Ownership Requirement

The stock ownership requirement is found in § 332(b)(1), which specifies an 80 percent voting and value requirement.[4] That requirement is not specifically at issue here, as parties agree that taxpayer owned 99.97 percent of Weston's stock until the transactions occurred on December 23, 1980.

At issue is the continuity requirement of § 332(b)(1)—whether taxpayer "has continued to be at all times until the receipt of the property" qualified under the 80 percent voting and value test. As explained by Treasury Regulation:

> The recipient corporation must have been the owner of the specified amount of such stock on the date of the adoption of the plan of liquidation and have continued so to be at all times until the receipt of the property. If the recipient corporation does not continue qualified with respect to the ownership of stock of the liquidating corporation and if the failure to continue qualified occurs at any time prior to the completion of the transfer of all the property, the provisions for the nonrecognition of gain or loss do not apply to any distribution received under the plan.

Treas.Reg. § 1.332–2(a) (1955). The question, then, is whether taxpayer continued qualified with respect to the ownership of Weston stock until taxpayer received Weston's assets.

Section 332(b)(1) and Treas.Reg. § 1.332–2(a) each direct our inquiry to two time periods: "the date of the adoption of the plan of liquidation[;]" and "all times until the receipt of the property." We assume[5] for the purposes of the first inquiry that the adoption of the "Agreement and Plan of Merger" by Weston shareholders on December 20, 1980 was an adoption of a plan of liquidation. Taxpayer undisputedly owned 99.97 percent of Weston's stock at that time.

The key dispute concerns the effect of the merger and reorganization transactions on December 23, 1980—the date on which taxpayer received the property of its subsidiary. Taxpayer argues that because all of Weston's assets were transferred to Elder, Inc. and all of Weston's stock was cancelled under the merger, taxpayer's ownership of Weston stock was cut off *before* it received Weston's property. Therefore, taxpayer argues, because taxpayer owned no Weston stock when it subsequently received the property of its subsidiary under the reorganization, it did not continue qualified with respect to stock ownership under § 332(b)(1).

The government urges this court to disregard Elder, Inc.'s transitory ownership of Weston by applying the step transaction doctrine in holding that the merger and reorganization "should be collapsed and viewed as a single transaction for tax purposes." The district court agreed and "view[ed] the execution of the two integrated agreements as one transaction which did not effect a bonafide sale of stock and conclude[d], as a matter of law, that Super Market Developers, at all relevant times, owned more than 80 percent of the outstanding shares of Weston...." 720 F.Supp. at 890.

### A. The Step Transaction Doctrine

■ "The step-transaction doctrine developed as part of the broader tax concept that substance should prevail over form." *American Potash & Chem. Corp. v. United States*, 399 F.2d 194, 207, 185 Ct.Cl. 161 (1968); *see also Security Indus. Ins. Co. v. United States*, 702 F.2d 1234, 1244 (5th Cir.1983); Rosenberg, *Tax Avoidance and Income Measurement*, 87 Mich.L.Rev. 365, 400 (1988) [hereinafter *Rosenberg*]. Under the step transaction doctrine:

> interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction. By thus "linking together

---

**4.** Section 332(b)(1) was amended in 1986 to incorporate the "80–percent voting and value test" of I.R.C. § 1504(a)(2). *See* Pub.L. 99–514, § 1804(e)(6)(A) (1986). We apply the pre–1986 version which was applicable in 1980, as quoted in note 3.

**5.** Taxpayer's adoption of a plan of liquidation is discussed below.

all interdependent steps with legal or business significance, rather than taking them in isolation," federal tax liability may be based "on a realistic view of the entire transaction."

*Commissioner v. Clark,* 489 U.S. 726, 738, 109 S.Ct. 1455, 1462, 103 L.Ed.2d 753 (1989) (quoting 1 B. Bittker, *Federal Taxation of Income, Estates and Gifts* ¶ 4.3.5, p. 4–52 (1981)).

The step transaction principle derives from the classic tax case *Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), and its progeny. In *Gregory,* the Supreme Court's analysis of the tax effect of a transaction involved "[p]utting aside ... the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred...." *Id.* at 469, 55 S.Ct. at 267. The analysis revealed a transactional step which the Court characterized as "an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character," *id.,* and as "an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else." *Id.* at 470, 55 S.Ct. at 268. The Court declined to "exalt artifice above reality" and affirmed the appellate court's holding that there had been no reorganization in the meaning of the statute. *Id.*

The Supreme Court has affirmed the step transaction principle at least thrice since *Gregory.* In *Minnesota Tea Co. v. Helvering,* 302 U.S. 609, 613, 58 S.Ct. 393, 395, 82 L.Ed. 474 (1938), the Court stated "[a] given result at the end of a straight path is not made a different result because reached by following a devious path." It thus refused to accord tax effect to a "transparently artificial" and unnecessary step taken by the taxpayer in an attempt to avoid the tax result at the end of a debt payment transaction. *Id.* In *Commissioner v. Court Holding Co.,* the Court declared:

The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant.... To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

*Commissioner v. Court Holding Co.,* 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945). *See also Clark,* 489 U.S. at 738, 109 S.Ct. at 1462 (noting the step transaction doctrine is "well-established" and is "expressly sanctioned" by the Court).

Courts and commentators have identified several tests which are used with varying frequency in determining whether to apply the step transaction doctrine. Most sources identify three tests: *see, e.g., Security Indus.,* 702 F.2d at 1244–45 (identifying the "end result," "interdependence," and "binding commitment" tests); *McDonald's Restaurants of Illinois, Inc. v. Commissioner,* 688 F.2d 520, 524–25 (7th Cir.1982) (same); 11 J. Mertens, *The Law of Federal Income Taxation,* §§ 43.-254–43.256 (1990) (same); Comments, *Step Transactions,* 24 U.Miami L.Rev. 60, 62–66 (1969) (identifying the "time," "intention," and "interdependency" tests). Others differ: *see, e.g., King Enters., Inc. v. United States,* 418 F.2d 511, 516, 189 Ct.Cl. 466 (1969) (identifying "end result" and "interdependence" as the "two basic tests"); Schwartz, *Liquidation–Reincorporation: A Sensible Approach Consistent with Congressional Policy,* 38 U.Miami L.Rev. 231, 240 n. 33 (1984) (same). The "end result" and "interdependence" tests are the most frequently applied.[6] *See Security In-*

---

**6.** The "binding commitment" test, first enunciated in *Commissioner v. Gordon,* 391 U.S. 83, 88 S.Ct. 1517, 20 L.Ed.2d 448 (1968), has seldom been applied since. In *Gordon,* the Supreme Court refused to apply step transaction analysis to a multi-year series of stock transfers in the

*dus.*, 702 F.2d at 1244, and *Rosenberg*, at 409, respectively.

▪ Under the "end result" test, "purportedly separate transactions will be amalgamated into a single transaction when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result." *King Enters.*, 418 F.2d at 516 (quoting Herwitz, *Business Planning*, 804 (1966)). The "end result" test, like the substance over form principle,

> is particularly pertinent to cases involving a series of transactions designed and executed as parts of a unitary plan to achieve an intended result. Such plans will be viewed as a whole regardless of whether the effect of so doing is imposition of or relief from taxation. The series of closely related steps in such a plan are merely the means by which to carry out the plan and will not be separated.

*Kanawha Gas & Utils. Co. v. Commissioner*, 214 F.2d 685, 691 (5th Cir.1954). As this court once stated in affirming a judgment of relief from taxation, "the end result of the series of interrelated steps controls the tax consequences of the whole." *Atchison, Topeka & Santa Fe R.R. Co. v. United States*, 443 F.2d 147, 151 (10th Cir.1971).

▪ The "interdependence test" requires an inquiry as to "whether on a reasonable interpretation of objective facts the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." Paul & Zimet, "Step Transactions," *Selected Studies in Federal Taxation* 200, 254 (2d Series 1938), *quoted in King Enters.*, 418 F.2d at 516, and *Security Indus.*, 702 F.2d at 1244. The "interdependence test" focuses on the relationship between the steps, rather than on the "end result." *McDonald's Restaurants*, 688 F.2d at 524. Disregarding the tax effects

of individual steps under this test is, therefore, "especially proper where ... it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts...." *Kuper v. Commissioner*, 533 F.2d 152, 156 (5th Cir. 1976).

We now consider taxpayer's claim that relevant case law bars the use of step transaction analysis in the context of § 332. Taxpayer most heavily relies on *Granite Trust Co. v. United States*, 238 F.2d 670 (1st Cir.1956), a taxpayer refund suit involving the liquidation of a corporate subsidiary. In *Granite Trust*, the First Circuit considered whether to allow the taxpayer to avoid the nonrecognition provisions of I.R.C. § 112(b)(6) (1939), the predecessor to modern code section 332. *Granite Trust*, 238 F.2d at 673.

Taxpayer Granite Trust Company (Granite) expected to realize losses upon the liquidation of its wholly owned subsidiary, Building Corp. Granite therefore took two steps to avoid the nonrecognition provisions of § 112(b)(6). First, Granite sold 20.5 percent of Building Corp.'s stock in order to circumvent the 80 percent ownership requirement of § 112(b)(6). *Id.* at 672. Second, after adopting a liquidation plan, Granite sold twenty shares of stock and donated two shares to charity. *Id.* at 673. The dispositions were intended to circumvent the "second condition" of § 112(b)(6), one which was not included in modern code section 332. *See id.* at 672 n. 1, 675. That condition allowed recognition of gains or losses where the parent corporation, within a specified time period, disposed of stock in the subsidiary without making countervailing acquisitions. *Id.* at 675. The *Granite Trust* court ruled on the merits only as to the second step, and allowed taxpayer to recognize its loss. *See id.* at 675.

Because *Granite Trust*'s decision in favor of the taxpayer hinged on a provision

---

absence of a "binding commitment" to take the later steps. 391 U.S. at 96, 88 S.Ct. at 1524–25. "Subsequent decisions ... have tended to confine *Gordon* to its facts." *Security Indus.*, 702 F.2d at 1245. As one writer observed, "courts, commentators, and the Internal Revenue Ser-

vice have generally rejected the use of the binding commitment test." *Rosenberg*, at 406. Because this case does not involve a series of transactions which spans several years, we do so as well.

which is no longer present in the Code, *Granite Trust* is not dispositive in this case. However, to the extent the *Granite Trust* court discussed provisions of § 112(b)(6) which are still contained in modern § 332, some of its reasoning is persuasive.

Granite prevailed over the government's arguments against its recognition of losses. First, the government advanced the "end-result" test in urging the court to ignore the intermediate steps in Granite Trust's liquidation of Building Corp. *Id.* at 674. The court rejected that argument, stating "the very terms of § 112(b)(6) make it evident that it is not an 'end-result' provision, but rather one which prescribes specific conditions for the nonrecognition of realized gains or losses, conditions which, if not strictly met, make the section inapplicable." *Id.* at 675. The court found support in the legislative history of both § 112(b)(6) (1939) and § 332 (1954), and concluded "that taxpayers can, by taking appropriate steps, render the subsection applicable or inapplicable as they choose, rather than be at the mercy of the Commissioner on an 'end-result' theory." *Id.* at 676. The "interdependence test" was neither argued nor discussed.

Second, the government argued that there were *in fact* no valid sales made by the taxpayer, "that the sales of stock by [Granite Trust] should be ignored on the ground that they were not bona fide, and that the taxpayer therefore retained 'beneficial ownership.'" *Id.* at 677. The court adopted this view of the issue, stating:

> In the present case the question is whether or not there actually were sales. Why the parties may wish to enter into a sale is one thing, but that is irrelevant under the *Gregory* [*v. Helvering*] case so long as the consummated agreement was no different from what it purported to be.

*Id.* Thus, the court agreed the substance-over-form principle would control whether

the intermediate step in taxpayer's transaction should be given tax effect. If the purported sales were *in fact* sales, the government could not ignore their tax effect. The court analyzed the substance of the transaction and rejected the government's contention, stating:

> We find no basis on which to vitiate the purported sales, for the record is absolutely devoid of *any evidence indicating an understanding by the parties to the transfers that any interest in the stock transferred was to be retained by the taxpayer.* If Johnson or Richmond had gone bankrupt, or the assets of both had been attached by the creditors, on the day after the sales to them, we do not see how the conclusion could be escaped that their Building Corporation stock would have been included in their respective assets; and if Johnson or Richmond had died, surely the holdings of stock of each would have passed to his executors or administrators, or legatees.

*Id.* (emphasis added). The court ultimately concluded that because the facts "show[ed] legal transactions not fictitious or so lacking in substance as to be anything different from what they purported to be," the sales must be given effect in the administration of § 112(b)(6). *Id.* at 678. Therefore, the taxpayer was able to recognize the loss and claim a substantial tax refund.

In the present case, taxpayer asserts that *Granite Trust* and the legislative history discussed therein stand as a complete bar to any application of step transaction analysis in the context of § 332. We disagree. As an initial matter, the First Circuit considered only the "end result" formulation of the step transaction doctrine. 238 F.2d at 675. As noted, the "interdependence test" was neither argued nor considered in *Granite Trust*.[7] The legislative history discussed in *Granite Trust* is equally silent as to the "interdependence test." *Id.* at 675–77. Taxpayer fails to appreciate the differences between, and the

---

7. Taxpayer argues that because the *Granite Trust* transactions "clearly" would have met the interdependence test had it been applied, the court's failure to use that test constitutes proof that it believed all forms of the step transaction doctrine to be inapplicable to § 112(b)(6). We decline to indulge in such speculative reasoning.

different functions performed by, the "interdependence" and "end result" tests. As the "interdependence" test addresses the relationship between, and therefore the integrity of intermediate steps in a complex transaction, its application is not precluded by *Granite Trust*'s conclusion that a narrow focus on a transaction's "end result" is inappropriate in the context of § 112(b)(6).

Furthermore, although the First Circuit concluded from the legislative history that "taxpayers can, by taking appropriate steps, render the subsection applicable or inapplicable as they choose," *id.* at 676, we think taxpayer misinterprets that conclusion. The nonrecognition mandated by § 332 is not optional at the election of taxpayers within the reach of that section. "Section 332 is not elective. Nonetheless, a number of planning possibilities are evident which may allow a corporation to avoid the application of Section 332." 11 J. Mertens, *The Law of Federal Income Taxation* § 42.55 at 142 (1990). Steps taken by the taxpayer, however, are not immunized from "[t]he question ... whether the transaction under scrutiny is in fact what it appears to be in form." *Chisholm v. Commissioner*, 79 F.2d 14, 15 (2d Cir.), *cert. denied*, 296 U.S. 641, 56 S.Ct. 174, 80 L.Ed. 456 (1935). We find support for our conclusion in *Granite Trust*'s application of *Gregory*'s substance-over-form analysis. 238 F.2d at 677.

Appellant also relies on *Commissioner v. Day & Zimmermann, Inc.*, 151 F.2d 517 (3rd Cir.1945), another case where a taxpayer was able to recognize a loss despite § 112(b)(6). Yet the Third Circuit did not address the step transaction doctrine in *Day & Zimmermann*. The court took pains to verify the bona fides of the questioned transaction, and emphasized "there was no understanding of any kind between [the stock purchaser] and Day & Zimmerman by which the latter *retained any sort of interest in the securities or proceeds therefrom....*" 151 F.2d at 519. After a detailed analysis of the motivations of the actors, the court concluded, "the facts before us so manifestly point to the legitimacy of the ... purchase of stock that they offer no alternative but to accept that view of the transaction." *Id.*

*Granite Trust* discussed the significance of *Day & Zimmermann* in terms which indicate the preferred mode of analysis:

> The significant thing in the case is its ultimate rationale that *the purported sales* of stock to the treasurer *were in fact sales*, notwithstanding the tax motive which prompted the corporation to enter into the transaction; from which it would seem to be irrelevant how the transfer was arranged, or whether or not it occurred at a public auction or exchange, so long as the beneficial as well as legal title was intended to pass and did pass.

238 F.2d at 676 (emphasis added). Thus *Day & Zimmermann* reaffirms the necessity of determining whether the substance of a transaction matches its form.

Taxpayer also advances *George L. Riggs, Inc. v. Commissioner*, 64 T.C. 474 (1975), as support for the assertion that the step transaction doctrine is inapplicable in the § 332 context. *Riggs*, however, simply established the date on which petitioner adopted a plan of liquidation within the meaning of § 332. *Id.* at 482. *Riggs* does not address the applicability of step transaction analysis to transactions which are arguably within § 332. *See id.* at 482 n. 2 ("[The government] specifically does not rely on the 'end-result' or 'step-transaction' theory in this case.") *Riggs* followed *Granite Trust*, 238 F.2d at 676, in stating, "[b]ased on legislative history of this section and prior judicial decisions, we conclude that section 332 is elective in the sense that with advance planning and properly structured transactions, a corporation should be able to render section 332 applicable or inapplicable." 64 T.C. at 489. As noted above, however, such an ability precludes neither substance-over-form nor step transaction analysis.

Finally, taxpayer attempts to wield *Avco Mfg. v. Commissioner*, 25 T.C. 975 (1956) as support. The Tax Court enforced substance over form in *Avco*, stating, "if, upon [close] scrutiny, the sale appears to have been a bona fide transaction in that *it was*

*in substance what it purported to be in form,* then the tax motive therefor will be disregarded." *Id.* at 980 (emphasis added). Like the other cases offered by taxpayer, *Avco* applies the substance-over-form analysis of *Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), without precluding the applicability of step transaction analysis. *Avco,* 25 T.C. at 981. Taxpayer's contention that "all of the cases involving Section 332 expressly reject application of the step transaction doctrine" is simply unsupportable.

### B. Business Purpose

We now consider taxpayer's claim that "the step transaction doctrine is inapplicable where, as in the present case, there are valid business reasons for the intermediate steps." Taxpayer cites no authority for that contention other than Rev.Rul. 79–250.[8] The government's brief ignores taxpayer's discussion of Rev.Rul. 79–250, arguing on other grounds that "whether or not taxpayers had a valid business purpose for structuring the transaction as a merger is irrelevant."

Although the Rev.Rul. 79–250 at first appears to be applicable to the present case, taxpayer's use takes the ruling out of context. Rev.Rul. 79–250 applies not to § 332 liquidations, but rather by its own terms to § 368 and related regulations dealing with specific forms of corporate reorganizations which are not at issue here.[9] We do not think the ruling's discussion of business purpose and the step transaction doctrine in the context of corporate reorganizations was meant to restrict the application of step transaction analysis in different contexts.[10]

The law is unclear as to the relationship between the step transaction doctrine and the business purpose requirement. Our survey of the relevant cases suggests that no firm line delineates the boundary between the two.[11] Most cases applying the step transaction doctrine, far from identifying business purpose as an element whose *absence* is prerequisite to that application, do not even include discussion of business purpose as a related issue.[12] In some cases, the existence of a business purpose is considered one factor in determining whether form and substance coincide.[13] In others, the lack of business purpose is ac-

---

**8.** Rev.Rul. 79–250 states, inter alia:

> The Internal Revenue Service has indicated on several occasions that threshold steps will not be disregarded under a step transaction analysis if such preliminary activity results in a permanent alteration of a previous bona fide business relationship. Thus, the substance of each of a series of steps will be recognized and the step transaction doctrine will not apply, if each such step demonstrates independent economic significance, is not subject to attack as a sham, and was undertaken for valid business purposes and not mere avoidance of taxes.

Rev.Rul. 79–250, 1979–2 C.B. 156.

**9.** Rev.Rul. 79–250 states that the "applicable" Code sections and regulations are: § 368(a)(2)(D); § 368(a)(1)(F); Treas.Reg. § 1.368–1(b); and Treas.Reg. § 1.368–2(b)(2).

**10.** We note under *Gregory v. Helvering, see* 293 U.S. at 469, 55 S.Ct. at 267–68, corporate reorganizations require a business purpose in addition to the statutory requirements imposed by the Code. *See* 11 J. Mertens, *The Law of Federal Income Taxation* § 43.29 (1990). This requirement further distinguishes the context of Rev. Rul. 79–250 from this case.

**11.** As the Fifth Circuit explained, courts have responded to the "problem of deciding whether to accord the separate steps of a complex transaction independent significance, or to treat them as related steps in a unified transaction," and to related problems, by:

> "enunciat[ing] a variety of doctrines, such as step transaction, business purpose, and substance over form. Although the various doctrines overlap and it is not always clear in a particular case which one is most appropriate, their common premise is that the substantive realities of a transaction determine its tax consequences."

*King Enters.,* 418 F.2d at 516, 516 n. 6.

**12.** *See, e.g., Court Holding,* 324 U.S. 331, 65 S.Ct. 707; *Security Indus.,* 702 F.2d 1234; *King Enters.,* 418 F.2d 511; *Kanawha Gas,* 214 F.2d 685.

**13.** *See, e.g., Litton Indus., Inc. v. Commissioner,* 89 T.C. 1086, 1099 (1987); *Portland Mfg. Co. v. Commissioner,* 56 T.C. 58, 77 (1971) ("The artificiality of the transaction is apparent when it is realized that the Plylock assets moved through the corporate hands of Springfield and APC in a matter of days, never pausing long enough to serve any business purpose...."), *quoted in Kuper,* 533 F.2d at 158. *See also* cases cited in note 15.

cepted as reason to apply the step transaction doctrine.[14] We have found no case holding that the existence of a business purpose precludes the application of the step transaction doctrine.[15]

■ We therefore reject the contention that a valid business purpose bars application of step transaction analysis in this context. "A legitimate business goal does not grant [a] taxpayer carte blanche to subvert Congressionally mandated tax patterns." *Kuper*, 533 F.2d at 158. Moreover, we share the government's skepticism as to the alleged significance of taxpayer's claimed business purpose—that of cashing-out certain minority shareholders who collectively owned no more than 0.03 percent of Super Market Developer's stock.[16] Having thus rejected taxpayer's arguments against the applicability of step transaction analysis, we now apply it to the disputed transaction.

## C. Step Transaction Analysis Applied

■ The district court declined to apply the "end result" test. The court assumed that "section 332 is not an end result provision" and cited *Granite Trust* for that proposition. *Grocers*, 720 F.Supp. at 889.

In light of our earlier discussion of that case and the legislative history cited therein, we concur, and move on to consider the disputed transaction under the "interdependence" test.

■ We are mindful of "the central purpose of the step transaction doctrine: ensuring that the tax consequences of a particular transaction turn on substance rather than form." *Security Indus.*, 702 F.2d at 1245. Under the "interdependence test" we focus primarily on the relationship between the steps, *McDonald's Restaurants*, 688 F.2d at 524, and in so doing inquire whether " 'the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series.' " *Security Indus.*, 702 F.2d at 1244 (quoting Paul & Zimet, "Step Transactions," in *Selected Studies in Federal Taxation* 200, 254 (2d Cir.1938)). We find sufficient evidence of interdependence in the merger and reorganization agreements to answer that question conclusively.

The "Termination" clause included in the merger agreement is itself a strong indication of interdependence. That clause states:

14. *See, e.g., Packard v. Commissioner*, 85 T.C. 397, 419–22 (1985).

15. Taxpayer's citation to three cases for support in this proposition is fallacious. The first, *Vest v. Commissioner*, 57 T.C. 128 (1971), *rev'd in part & aff'd in part* on other grounds, 481 F.2d 238 (5th Cir.1973), considers business purpose as one factor among many in declining to apply the step transaction doctrine. After identifying a business purpose, the court undertakes a thorough discussion of whether to treat a stock exchange as a step transaction. 57 T.C. at 145. The court remarked "[t]he fact that there were business purposes for the incorporation of V Bar is *an indication* that its formation was not a step mutually interdependent with the subsequent stock exchange" and continued to consider other factors, including the existence of a binding commitment, the timing of the steps, and the actual intent of parties. *Id.* at 145–46 (emphasis added). Far from precluding step transaction analysis, the business purpose was not even considered the most significant factor in *Vest*.

*Weikel v. Commissioner*, 51 T.C.M. (CCH) 432 (1986), appears to support the proposition. *Weikel*, however, erroneously states that *Vest*

declined to apply step transaction analysis *because* a business purpose was found. *Id.* at 440. Because *Vest* said no such thing, *Weikel* must be discounted.

Finally, *Yamamoto v. Commissioner*, 73 T.C. 946 (1980), *aff'd*, 672 F.2d 924 (9th Cir.1982), mentions business purpose in passing in a discussion of "various factors considered in determining whether a series of transactions constitute an integrated scheme ... or whether the transactions should retain their separate identities." 73 T.C. at 953–54. Again, taxpayer's citation of cases proves to be faulty.

16. Taxpayer claims "[t]he specific business reasons for the merger were to eliminate the minority shareholders of Weston in a manner which would save the most time and money and avoid any ill-will among [Associated Grocers'] members." However, testimonial evidence suggests that taxpayer never made *any* inquiry beyond the tender offer as to the willingness of the minority shareholders to sell their outstanding 97 shares (out of a total of 329,963 shares) at any price. As we remain unconvinced of the problem's magnitude, we reject the suggestion that taxpayer's "purpose" in designing the merger and reorganization transaction was to resolve that problem.

*Termination.* If the Agreement and Plan of Reorganization dated as of December 11, 1980, which has been entered into between the Surviving Corporation [Elder Food Mart, Inc.] and Weston Investments, Inc., ... a Missouri corporation, is terminated prior to the Merger Date, then this Agreement of Merger shall simultaneously terminate without further action by the parties hereto.

Under the express terms of the merger agreement, the legal relations it created were entirely contingent on the continuing force of the reorganization agreement. Thus, the merger agreement would bear no fruit unless the two-step series could be completed.

The "Purchase and Sale" clause contained in plan of reorganization is another manifestation of the relationship between the two steps. It provides:

The Buyer [Super Market Developers] agrees to purchase from the Seller [Elder, Inc.] and the Seller agrees to sell to the Buyer all of the assets of every kind and description acquired by the Seller pursuant to the Agreement of Merger, except for the shares of common stock of Weston. As part of the consideration to the Seller for the purchase described in this paragraph, the Buyer agrees to assume and discharge all of the obligations and liabilities of the Seller which were formerly the obligations and liabilities of the Merging Corporation [Weston] and which became the obligations and liabilities of the Seller pursuant to the Agreement of Merger.

So interdependent were the two steps that the parties who drafted the agreement setting forth the second step did not think it necessary to separately list the assets (valued at over nine million dollars) which were bought and sold, or the obligations and liabilities which were assumed and discharged therein—they simply referenced the first agreement "attached hereto."

We also consider the timing of the steps in assessing their interdependence. Again, that matter was squarely addressed by the parties to the transactions. Under the terms of the reorganization agreement:

The merger shall become effective at, and the Merger Date shall mean, *for the purpose of this Agreement and the Agreement of Merger,* the close of business on the date when the Agreement of Merger is filed with the Secretary of State of the State of Missouri in accordance with Missouri law. The closing of the transactions provided for herein shall take place on the date (the "Closing Date") which is the same day as the Merger Date *immediately following* the time of effectiveness of the merger.

(Emphasis supplied). This provision is remarkable for at least two reasons. First, it allows virtually no time to pass between the effectiveness of the two steps which taxpayer vociferously argues are separate transactions. Second, the plan of reorganization actually sets forth the time at which the merger (supposedly a separate transaction controlled by a second agreement) will become effective.

No further proof of the interdependence of the steps is necessary. The degree of interconnectedness seen here is sufficient under the law to require us to ignore the form of these steps if that form belies the substance of the transaction as a whole. "The question always is whether the transaction under scrutiny is in fact what it appears to be in form...." *Chisholm,* 79 F.2d at 15. That question arises because "[t]axpayers cannot compel a court to characterize the transaction solely upon the basis of a concentration on one facet of it when the totality of the circumstances determines its tax status." *Kuper,* 533 F.2d at 156 (quoting *Crenshaw v. United States,* 450 F.2d 472, 477 (5th Cir.1971), *cert. denied,* 408 U.S. 923, 92 S.Ct. 2490, 33 L.Ed.2d 333 (1972)). We reject taxpayer's characterization when doing so is necessary to respect "the Congressional policy to tax transactional realities rather than verbal labels.... Otherwise, form, rather than substance, would invariably prevail." *Id.* (quoting *Crenshaw,* 450 F.2d at 477–78).

### D. Substance Over Form

In giving effect to the substance of the overall transaction, we ignore acts taken in

intermediate steps which the taxpayer has itself undone with subsequent steps. We also treat as significant the existence of an understanding between the parties that an interest in the assets transferred would be retained by the taxpayer. *See Granite Trust*, 238 F.2d at 677; *Day*, 151 F.2d at 519. The transaction of December 23, 1980 involved two steps—the "merger" of Weston into Elder, Inc. and the "reorganization" of Super Market Developers and Elder, Inc. Under the first step, Elder, Inc. paid taxpayer $300,000 cash and a promissory note for all of Weston's assets. The shares of minority shareholders were also converted to cash. Under the second step, taxpayer "immediately" bought back the same assets except for Weston Market, paying "an amount equal to the principal amount of the promissory note ... plus an amount equal to the cash received by the [minority] shareholders." Excepting the exchange of Weston Market for $300,000, all acts were undone: taxpayer got back the other assets; Elder, Inc. got the value of the note back; and taxpayer fully reimbursed Elder, Inc. for cashing out the minority shareholders.[17]

The transparent form of the transaction fails to obscure its obvious substance: Elder, Inc. bought Weston Market for $300,000 cash, and Weston was liquidated. In light of this transactional substance, we reject taxpayer's claim to have disposed of Weston's stock *before* Weston's assets were distributed. Accordingly, taxpayer did continue qualified with respect to Weston stock ownership in the meaning of § 332.

### III. Asset Distribution and Liquidation Plan

Taxpayer also argues the requirements of § 332 were not met because all of Weston's assets were not transferred to Super Market Developers, and because the share-holders of Weston adopted a plan of merger, rather than a plan of liquidation. This argument is, of course, premised on the transactional form which we have rejected in favor of substance.

As noted above, § 332(b)(2) provides that where:

the distribution is by such other corporation in complete cancellation or redemption of all its stock, and the transfer of all the property occurs within the taxable year; in such case the adoption by the shareholders of the resolution under which is authorized the distribution of all the assets of such corporation in complete cancellation or redemption of all its stock shall be considered an adoption of a plan of liquidation....

Section 332(b)(2) applies to distributions in complete liquidation of subsidiaries when the "transfer of all the property occurs within the taxable year." I.R.C. § 332(b)(2). Such is the case here, as all the assets of Weston were transferred on the same day—December 23, 1980.

Taxpayer argues, however, that because some but not all of Weston's assets were distributed to Super Market Developers, there was no transfer of all the property under the statute. Taxpayer further argues "Elder, Inc. kept the Weston Market subsidiary stock and, unlike a liquidation of Weston, [Super Market Developers] and the other individual shareholders of Weston did not receive stock of all of the subsidiaries owned by Weston." Taxpayer cites no authority in support of its argument.

Given our holding that the step whereby Weston stock was briefly transferred to Elder, Inc. must be disregarded, this argument is rejected. First, there was a resolution authorizing the distribution of Weston's assets in complete cancellation or redemption of all its stock—the shareholders of Weston approved the Plan of Merger by majority vote on December 20, 1980.[18] Un-

---

**17.** Although the act of cashing out the minority shareholders was not undone, taxpayer replaced Elder, Inc. as the entity that paid for that act.

**18.** Because the Plan of Merger authorized a distribution in complete cancellation or redemption of all of Weston's stock, we consider the adoption of that plan by the shareholders to be the adoption of a plan of liquidation. No more is required by the statute. *See* § 332(b)(2); *cf. Burnside Veneer Co. v. Commissioner*, 167 F.2d 214, 217 (6th Cir.1948) ("The statute does not require a formal plan.").

der the transactions of December 23, 1980, Weston stock was cancelled or redeemed [19] and its shareholders—both Super Market Developers and the minority shareholders—received payment in distribution of Weston's assets.[20] Second, Elder, Inc. did not "keep" the stock of Weston Market, as taxpayer suggests, because when the form of the transaction is ignored, the substance of the transaction is that Elder, Inc. did not buy Weston stock—it bought Weston Market.

Taxpayer also advances an "alternative characterization" of the transaction which it prefers to the Government's liquidation theory. We find no merit in that recharacterization, or in taxpayer's assertion that the district court improperly applied the step transaction doctrine to the facts of this case.

■ Finally, taxpayer's objection to the alleged "harshness" of the nonrecognition of its tax loss is insufficient to sustain its claim. We must apply the tax effects of the tax code to transactional substance, not form.

### Conclusion

As the substance of the disputed transaction met the requirements of I.R.C. § 332, no gain or loss shall be recognized. The district court's Order of September 19, 1989 granting summary judgment in favor of the government and denying taxpayer's motion for summary judgment is hereby AFFIRMED.

---

**19.** Under the plan of merger all shares of Weston stock were either converted into and exchanged for cash and a promissory note or retired and cancelled. Furthermore, the agreement provided, "[t]he cash and Note into which shares of Common Stock shall have been converted pursuant to this Section 4 shall be deemed to have been issued in full satisfaction of all rights pertaining to such converted shares."

**20.** Holders of less than 300 shares of common stock (all of the minority shareholders) received $28.50 per share; the other shareholder (Super Market Developers) received the rest of Weston's assets.